**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

JIMMY DEAN HARRIS,

      Petitioner - Appellant,

v.

TOMMY SHARP, Interim Warden,
Oklahoma State Penitentiary,[*]

      Respondent - Appellee.

No. 17-6109

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:08-CV-00375-F)**
_____

Jack Fisher, Fisher Law Office, Edmond, Oklahoma, and Emma V. Rolls, Assistant Federal Public Defender, Oklahoma City, Oklahoma, on behalf of the Petitioner-Appellant.

Jennifer L. Crabb, Assistant Attorney General (Mike Hunter, Attorney General of Oklahoma, with her on the briefs), Oklahoma City, Oklahoma, on behalf of the Respondent-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

---

[*] Pursuant to Fed. R. App. P. 42(c)(2), Mike Carpenter is replaced by Tommy Sharp, as the Interim Warden of the Oklahoma State Penitentiary.

# TABLE OF CONTENTS

Background ......................................................................... 2

The Standard of Review ....................................................... 3

Appellate Arguments Covered in an
Existing Certificate of Appealability ............................... 5

I.    Ineffective Assistance of Counsel ......................................... 5

    A.    The *Strickland* Standard ............................................ 6

    B.    Failure to Seek a Pretrial Hearing on Intellectual
         Disability as a Bar to Execution ................................... 7

         1.    The Standard of Review ...................................... 9

         2.    Deficiency Prong ............................................... 13

         3.    Prejudice Prong ................................................ 18

              (a)    Unreasonable Determination of Fact ............. 19

              (b)    The Need for an Evidentiary Hearing ............ 26

              (c)    Conclusion ................................................ 36

    C.    Failure to Adequately Present Mitigation Evidence ......... 37

         1.    The Legal Standard and the Standard of Review ...... 38

         2.    Intellectual Impairment as a Mitigating Factor ........ 38

              (a)    Evidence of an Intellectual Impairment .......... 39

              (b)    Mitigation Evidence Involving an Intellectual
                       Disability ................................................... 41

              (c)    Mitigation Evidence Involving Borderline
                       Intellectual Functioning .............................. 45

i.     The OCCA's Reliance on Both Prongs (Deficient Performance and Prejudice) .. 45

ii.    Deficient Performance ......................... 46

iii.   Prejudice ............................................. 50

(d)   Mitigation Evidence Involving Mental Illness ................................................. 52

i.     Mental Health Evidence in the 2005 Retrial ...................................... 53

ii.    Other Existing Evidence of Mr. Harris's Mental Illness .................................... 54

iii.   Claim of Ineffective Assistance of Counsel ............................................. 55

a.    Deficiency Prong ....................... 56

(i)    Unreasonable Factual Determinations ................... 56

(ii)   Unreasonable Application of Supreme Court Precedents ... 58

b.    Prejudice ................................... 59

II.   Jury Instructions and Closing Arguments as to Mitigation Evidence ................................................. 63

A.   The Standard of Review ............................................. 64

B.   The Jury Instruction ................................................. 66

C.   The Prosecutors' Closing Arguments ............................ 67

1.   Applicability of 28 U.S.C. § 2254(d) ..................... 69

2.   Unreasonable Determination of Fact ...................... 70

3.   Unreasonable Application of Supreme Court Precedent ......................................................... 74

III.   Victim-Impact Testimony ....................................................... 81

    A.   The Constitutional Limit on Victim-Impact Testimony ..... 81

    B.   The Victim-Impact Testimony and the Issue of
        Harmlessness ......................................................... 82

    C.   Structural or Harmless Error ......................................... 83

    D.   Harmlessness ........................................................... 85

IV.   Cumulative Error ................................................................. 89

Motion to Expand the Certificate of Appealability ........................... 91

Conclusion ................................................................................ 94

Mr. Jimmy Dean Harris was convicted of first-degree murder and sentenced to death. He appealed, and the Oklahoma Court of Criminal Appeals (OCCA) reversed his sentence and remanded for a retrial at the penalty phase. After the retrial, the state district court reimposed the death penalty. Mr. Harris appealed and sought post-conviction relief in state court. When these efforts failed, he brought a habeas petition in federal district court. The court denied relief, and Mr. Harris appeals.

On appeal, Mr. Harris argues in part that his trial counsel was ineffective in failing to seek a pretrial hearing on the existence of an intellectual disability, which would have prevented the death penalty.[1] The federal district court rejected this claim. In our view, the district court should have conducted an evidentiary hearing to decide this claim, so we reverse and remand for further consideration. Given the need to remand on this issue, we also remand for the district court to reconsider the claim of cumulative error. But we affirm the denial of habeas relief on Mr. Harris's other claims.

---

[1] Older opinions often used the term "mentally retarded." *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002). But more recently, we have used the term "intellectually disabled." *See Postelle v. Carpenter*, 901 F.3d 1202, 1210 n.4 (10th Cir. 2018); *cf.* Rosa's Law, Pub. L. No. 111-256, 124 Stat. 2643 (2010) (changing references in federal law from "mental retardation" and "mentally retarded" to "intellectual disability" and "intellectually disabled").

## Background[2]

Jimmy Dean Harris and Pam Harris were married for about twenty years. Mr. Harris repaired transmissions, as did Pam, who worked for Mr. Merle Taylor. With the passage of time came marital strain between Mr. Harris and Pam.

In 1999, Pam obtained a divorce and restraining order, requiring Mr. Harris to move out of their house. He complied, moving his belongings into a storage shed, but he grew distraught—crying, drinking, and taking Valium.

The next day, Pam returned home and discovered that Mr. Harris had vandalized the house and moved some of her belongings into the storage shed. This incident led Pam to change the locks and to obtain a second restraining order, which required Mr. Harris to stay away from the house.

Mr. Harris repeatedly asked Pam to allow him to retrieve his tools. After a few days, Mr. Harris went to Pam's workplace and shot at her, Mr. Taylor, and his daughter (Jennifer Taylor). Mr. Taylor died, Pam was wounded, and Jennifer Taylor escaped without injury.

---

[2]    Under the Antiterrorism and Effective Death Penalty Act (AEDPA), we defer to the OCCA's factual findings absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). We thus state the facts as the OCCA found them unless noted otherwise.

At a 2001 trial, the jury found Mr. Harris guilty of first-degree murder in the death of Merle Taylor and recommended the death penalty, finding one aggravating circumstance (creation of a substantial risk of death to more than one person).[3] As noted above, the death sentence was vacated by the OCCA in a prior appeal. At the 2005 retrial on the penalty, the prosecution alleged two aggravating factors:

1. Mr. Harris created a substantial risk of death to more than one person.

2. Mr. Harris posed a continuing threat to society.

The jury found both aggravating factors and again recommended the death penalty. The trial court agreed with the recommendation and resentenced Mr. Harris to the death penalty.

**The Standard of Review**

We engage in de novo review of the federal district court's legal analysis. *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013). In district court, review is deferential when the state appellate court rejects a claim on the merits. After rejection of the claim in state court, the federal district court can reach the merits only if the state appellate court's decision was

- contrary to, or involving an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3] The jury also found Mr. Harris guilty of attempted murder as to Pam.

3

- based on an unreasonable determination of the facts given the evidence presented in state court.

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d).

To determine whether a state-court decision was contrary to, or involved an unreasonable application of, clearly established law, we engage in a two-step process. *Budder v. Addison*, 851 F.3d 1047, 1051 (10th Cir.), *cert. denied*, 138 S. Ct. 475 (2017). We first determine the clearly established law by considering Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 379 (2000). We then ask whether the state court's decision was contrary to, or involved an unreasonable application of, that precedent. *Id.*

We must defer to the state court's factual findings unless "the state court[] plainly misapprehend[ed] or misstate[d] the record in making [its] findings, and the misapprehension goes to a material factual issue that is central to [the] petitioner's claim." *Ryder* ex rel. *Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016) (quoting *Byrd v. Workman*, 645 F.3d 1159, 1171–72 (10th Cir. 2011)). To overcome the state appellate court's factual findings, the petitioner must show that they are objectively unreasonable. *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018).

If the state's highest court acted unreasonably in applying Supreme Court precedent or finding facts, the district court must decide whether the

conviction or sentence violated the Constitution. *See Fry v. Pliler*, 551 U.S. 112, 119 (2007) (stating that 28 U.S.C. § 2254(d) provides "precondition[s] to the grant of habeas relief . . . , not an entitlement to it"); *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015) ("[E]ven when petitioners satisfy the threshold in § 2254(d), they must establish a violation of federal law or the federal constitution.").

**Appellate Arguments Covered in an
Existing Certificate of Appealability**

Our court previously granted a certificate of appealability on Mr. Harris's appellate arguments involving ineffective assistance of counsel, an improper jury instruction on mitigation evidence, improper closing arguments about the mitigation evidence, improper victim testimony recommending a particular sentence, and cumulative error. We reverse and remand for further consideration of the claims involving (1) ineffective assistance in the failure to seek a pretrial hearing on an intellectual disability and (2) cumulative error.

## I.    Ineffective Assistance of Counsel

The Sixth Amendment entitles a defendant to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). Invoking this amendment, Mr. Harris argues that his attorney at the 2005 retrial was ineffective for failing to

- seek a pretrial hearing on the existence of an intellectual disability, which would have precluded the death penalty,

- present additional trial evidence for mitigation based on an intellectual disability, and

- present additional mitigation evidence at trial regarding a lesser intellectual impairment or mental illness.

## A. The *Strickland* Standard

To address Mr. Harris's arguments, the district court needed to apply the two-part test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).

Under the first part of the test, the court was to determine whether Mr. Harris's attorney was deficient. Attorneys are deficient when their mistakes are so serious that they stop functioning as "counsel" for purposes of the Sixth Amendment. *Id.* at 687. In making this determination, the court ordinarily presumes that counsel's performance is reasonable and might entail a sound strategy. *Newmiller v. Raemisch*, 877 F.3d 1178, 1196 (10th Cir. 2017). In capital cases, however, courts scrutinize attorney performance particularly closely in the sentencing phase. *Littlejohn v. Trammel*, 704 F.3d 817, 859 (10th Cir. 2013).

To overcome this presumption, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This inquiry is "highly deferential," and courts should avoid "the distorting effects of hindsight." *Id.* at 689. Strategic decisions after a "thorough investigation" are afforded even greater deference and are "virtually unchallengeable." *Id.* at 690.

6

"Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington v. Richter*, 562 U.S. 86, 105 (2011).

When a habeas petitioner alleges ineffective assistance of counsel, deference exists both in the underlying constitutional test (*Strickland*) and the AEDPA's standard for habeas relief, creating a "doubly deferential judicial review." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Under this double deference, we consider "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard." *Ellis v. Raemisch*, 872 F.3d 1064, 1084 (10th Cir. 2017) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis in original)).

The petitioner must show not only a deficiency in the representation but also prejudice. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). For prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

## B. Failure to Seek a Pretrial Hearing on Intellectual Disability as a Bar to Execution

Mr. Harris argues that his counsel was ineffective for failing to seek a pretrial hearing on an intellectual disability that would render him ineligible for the death penalty. This argument is based on *Atkins v. Virginia*, 536 U.S. 304 (2002), where the Supreme Court concluded that the

execution of intellectually disabled persons violates the Eighth Amendment's prohibition on cruel-and-unusual punishment. 536 U.S. at 317, 321.[4]

Despite this conclusion, the Supreme Court allowed states to establish their own standards for an intellectual disability. *Id.* at 317 n.22. We thus focus on the content of Oklahoma law (when Mr. Harris's retrial took place). At that time, Oklahoma law allowed consideration of an intellectual disability only if the defendant had at least one IQ score under 70. *See Murphy v. State*, 54 P.3d 556, 567–68 (Okla. Crim. App. 2002), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). Upon such a showing, the defendant could then establish an intellectual disability by proving intellectual and adaptive deficits and manifestation before age eighteen. *Id.*; *see* p. 31, below.

Mr. Harris argues that his attorney was ineffective by failing to ask for a pretrial hearing on intellectual disability. To address this argument, we consider and apply the standard of review.

---

[4]    In the first direct appeal, Mr. Harris's appellate counsel invoked *Atkins*, urging the OCCA to remand for the state trial court to determine the existence of an intellectual disability. But the OCCA vacated the sentence without reaching this issue. *Harris v. State*, 84 P.3d 731, 757 (Okla. Crim. App. 2004).

## 1.    The Standard of Review

In denying relief on this claim, the OCCA explained that "[Mr.] Harris must [1] show that counsel's performance was so deficient that he did not have counsel as guaranteed by the Sixth Amendment, and that [2] the deficient performance created errors so serious as to deprive him of a fair trial with reliable results." *Harris v. State*, 164 P.3d 1103, 1114 (Okla. Crim. App. 2007). The OCCA rejected this claim on the ground that Mr. Harris could not establish prejudice. *See id*. at 1115–16 (concluding that "Harris cannot show he was prejudiced by counsel's failure" because "[w]e cannot conclude there was a reasonable probability that, but for counsel's omission, the results of this resentencing proceeding would have been different").

The State nevertheless argues that the OCCA implicitly decided the deficiency prong on the merits. The State's argument conflates two of the OCCA's determinations: One involves Mr. Harris's claim that his counsel failed to seek a pretrial hearing on the existence of an intellectual disability; the other determination involves Mr. Harris's claim that his counsel failed to adequately present mitigating evidence at the trial. *See Harris v. State*, 164 P.3d 1103, 1118 (Okla. Crim. App. 2007). For the second claim (failure to adequately present mitigating evidence at the trial), the OCCA addressed the merits of the deficiency prong.  But the OCCA did not address the deficiency prong on the first claim (failure to

9

seek a pretrial hearing on intellectual disability). For this claim, the OCCA expressly rested on the prejudice prong without any mention of the deficiency prong. *Harris v. State*, 164 P.3d 1103, 1115–16 (Okla. Crim. App. 2007).

Because the OCCA did not adjudicate the merits of the deficiency prong on this claim, we engage in de novo review of this part of the district court's ruling. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (reviewing de novo the prejudice prong of an ineffective-assistance claim because the state court had not reached this prong); *Smith v. Sharp*, 935 F.3d 1064, 1072 (10th Cir. 2019) ("[I]n cases in which a state court addresses only one prong of a multi-prong analysis, the Supreme Court requires that federal habeas courts address the other prongs de novo.").

But the OCCA did reach the merits of the prejudice prong, rejecting Mr. Harris's arguments. Still, Mr. Harris argues that we should engage in de novo review on this prong because the OCCA did not

- sufficiently consider Dr. Callahan's report or
- permit an evidentiary hearing.

Mr. Harris did not raise his first argument (insufficient consideration of the evidence by the OCCA) in district court. Even in habeas cases involving the death penalty, we consider arguments forfeited or waived when they are raised for the first time on appeal. *See Hancock v. Trammell*,

798 F.3d 1002, 1011 (10th Cir. 2015) (forfeited); *Owens v. Trammell*, 792 F.3d 1234, 1246 (10th Cir. 2015) (waived).[5]

Mr. Harris's second argument (the OCCA's denial of an evidentiary hearing) is based on *Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (en banc), where we considered the OCCA's denial of an evidentiary hearing and rejection of an ineffective-assistance claim without considering material non-record evidence. In these circumstances, we concluded that the denial did not constitute an adjudication on the merits under § 2254(d). *Wilson*, 577 F.3d at 1300.

After we issued this opinion, however, the OCCA clarified its procedures for deciding these claims. *Simpson v. State*, 230 P.3d 888 (Okla. Crim. App. 2010). Given this clarification, we concluded in *Lott v. Trammell* that

- *Wilson* no longer applies and

- any denial of a request for an evidentiary hearing on an ineffective-assistance claim constitutes an adjudication on the merits.

---

[5]     Our precedents are inconsistent in discussing preservation in cases involving 28 U.S.C. § 2254. We sometimes treat unpreserved issues as waived, sometimes as forfeited. *See Harmon v. Sharp*, 936 F.3d 1044, 1085–91 (10th Cir. 2019) (Holmes, J., concurring) (discussing this inconsistency in our case law). The difference here is academic. If the issue involves forfeiture rather than waiver, we could consider the issue under the plain-error standard. *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007). But Mr. Harris has not argued plain error, so we would not entertain the issue even if it had been forfeited rather than waived. *See Hancock*, 798 F.3d at 1011.

11

705 F.3d 1167, 1213 (10th Cir. 2013). Mr. Harris's argument is thus foreclosed by *Lott*.

Mr. Harris contends that (1) the panel in *Lott* could not overrule the en banc opinion in *Wilson* and (2) the OCCA's clarification of the standard came after the OCCA had rejected Mr. Harris's argument. We reject both contentions.

It is true that a panel typically cannot overrule an earlier precedent. *United States v. White*, 782 F.3d 1118, 1123 n.2 (10th Cir. 2015). But a panel is not bound by precedents that have been superseded by a change in state law. *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003). Our interpretation of state law changed when the OCCA clarified the standard for adjudicating a request for an evidentiary hearing. *Lott*, 705 F.3d at 1213.

As Mr. Harris points out, the OCCA had rejected his argument before the OCCA clarified the state-law standard. But the same was true in *Lott*, and we relied there on the OCCA's clarification in deciding that the denial of an evidentiary hearing constituted an adjudication on the merits. *Id.* This approach makes sense because the OCCA was clarifying what its rules had already been and didn't suddenly start adjudicating the merits when denying evidentiary hearings. *Wilson v. Trammell*, 706 F.3d 1286, 1311 (10th Cir. 2013) (Gorsuch, J., concurring). Before *Lott*, we had simply

12

misunderstood Oklahoma law. *See id.* ("[T]he OCCA has explained that *Wilson* was mistaken in its understanding of Oklahoma law."). Under *Lott*, we thus consider the OCCA's denial of an evidentiary hearing on an ineffective-assistance claim as an adjudication on the merits.

We thus engage in de novo review of the OCCA's ruling on the deficiency prong, but we apply § 2254(d)'s deferential standard of review on the prejudice prong.

## 2. Deficiency Prong

Applying de novo review, we conclude that Mr. Harris's attorney was deficient in failing to request a pretrial hearing to assess an intellectual disability.

The State argues that defense counsel strategically decided to forgo a pretrial hearing after a thorough investigation. Strategic decisions draw considerable deference when the attorney has thoroughly investigated the law, the facts, and the plausible alternatives. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). But merely calling something a strategy does not prevent meaningful scrutiny. We must still determine (1) whether an attorney has chosen to forgo a course of action and (2) whether that choice was reasonable under the circumstances. *Brecheen v. Reynolds*, 41 F.3d 1343, 1369 (10th Cir. 1994).

In assessing the reasonableness of an attorney's investigation, we engage in close scrutiny during the penalty phase of capital cases.

13

*Littlejohn v. Trammell*, 704 F.3d 817, 859 (10th Cir. 2013). In these cases, "we refer to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases." *Id.* These guidelines require that "[c]ounsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client." ABA Guidelines § 10.11(L). One appropriate opportunity involved a pretrial hearing on the existence of an intellectual disability.[6] *State* ex rel. *Lane v. Bass*, 87 P.3d 629, 633 (Okla. Crim. App. 2004), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). Had Mr. Harris been found intellectually disabled, he would have been ineligible for the death penalty. *Id.* at 632.

When the 2005 retrial took place, Oklahoma law permitted pretrial evidentiary hearings before a judge on the existence of an intellectual disability. *See State* ex rel. *Lane v. Bass*, 87 P.3d 629, 633–35 (Okla. Crim. App. 2004), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). If the defendant preferred a jury, he or she could also opt for a jury finding on the existence of an

---

[6]    Alternatively, Mr. Harris could have asked the trial jury to determine the existence and impact of an intellectual disability. *Lane*, 87 P.3d at 632. But Mr. Harris argues only that his attorney should have requested a pretrial hearing.

intellectual disability. If the jury found no intellectual disability, the defendant could ask the judge to revisit the issue after the trial. *Id.* at 635.

So if the judge or jury found no intellectual disability, the defense would have lost nothing. But if either the judge or jury found an intellectual disability, the death penalty would have vanished as a possibility. Defense counsel thus had a risk-free opportunity to avoid the death penalty. *Frazier v. Jenkins*, 770 F.3d 485, 501 (6th Cir. 2014)[7]; *see Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (holding that defense counsel was deficient by failing to file a timely notice of an alibi defense when counsel had "everything to gain" and "nothing to lose"); *see also Browning v. Baker*, 875 F.3d 444, 473 (9th Cir. 2017) ("[T]he obligation to investigate, recognized by *Strickland*, exists when there is no reason to believe doing so would be fruitless or harmful.").[8]

---

[7] The *Frazier* court explained: "[W]e fail to see the downside in having a non-frivolous *Atkins* hearing, and it is difficult to ascertain a strategic reason for withdrawing the motion [for an *Atkins* hearing] in this case." 770 F.3d at 501.

[8] At oral argument, the State also suggests that Mr. Harris might have wanted to avoid the delay from a pretrial hearing on intellectual disability. But the State had never before argued in state or federal court that Mr. Harris wanted to expedite his capital proceedings. *See United States v. Gaines*, 918 F.3d 793, 800–801 (10th Cir. 2019) ("We typically decline to consider an appellee's contentions raised for the first time in oral argument.").

Though no downside existed,[9] a pretrial hearing had considerable upside. The evidence of an intellectual disability was ready-made. For example, Mr. Harris had IQ scores under the 70-point threshold necessary for a determination of intellectual disability under Oklahoma law. *Murphy v. State*, 54 P.3d 556, 567–68 (Okla. Crim. App. 2002), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). One expert witness, Dr. Martin Krimsky, had already diagnosed Mr. Harris with a mild intellectual disability. And other evidence of Mr. Harris's difficulties in intellectual and adaptive functioning had already been introduced at a competency hearing and the 2001 trial.

The State contends that defense counsel did not request a pretrial hearing because he believed that Mr. Harris was not intellectually disabled.[10] For this contention, the State points to the voir dire, where

---

[9]    We do not suggest that counsel should always argue points lacking any downside. *See Knowles v. Mirzayance*, 556 U.S. 111, 121–22 (2009) (stating that counsel may not be ineffective by declining to assert a defense even when there is nothing to lose).

[10]    In oral argument, the State also argues for the first time that a pretrial hearing on intellectual disability might have generated new evidence for the State to support an aggravating circumstance. This argument was omitted in the briefs. *See* note 8, above. But even if we were to consider this argument, the State does not explain what new evidence would have been elicited at the pretrial hearing that had not already been fully aired in the 2001 proceedings. Those proceedings included a competency hearing and trial, and both included considerable evidence of Mr. Harris's mental state. In fact, the State ultimately conceded that any

16

defense counsel conceded that Mr. Harris was not intellectually disabled. We do not know why defense counsel made this concession,[11] and there is nothing to suggest that he had investigated the possibility of an intellectual disability. Before this concession, Dr. Krimsky had already testified that Mr. Harris *was* intellectually disabled. Even if defense counsel had disagreed with Dr. Krimsky's assessment, the ABA guideline required him to take advantage of every opportunity to argue against a death sentence. One such opportunity existed for a pretrial hearing on an intellectual disability, and the failure to request this hearing fell outside the acceptable range of reasonable performance. *See Williamson v. Ward*, 110 F.3d 1508, 1517–18 & n.12 (10th Cir. 1997) (concluding that the petitioner's counsel was ineffective in failing to seek a competency hearing given the existing evidence of incompetency and the lack of any strategic advantage).

\* \* \*

Defense counsel had nothing to lose by requesting a pretrial hearing on an intellectual disability. Prevailing would have eliminated the possibility of the death penalty, and losing would have left Mr. Harris

---

resulting evidence in aggravation had already been created in the 2001 proceedings. We thus reject the State's eventual argument that the pretrial hearing might have generated additional evidence of an aggravating circumstance.

[11] When defense counsel made the concession, he was supposed to be asking questions to the venirepersons.

precisely where he would be anyway, free to urge acquittal and a life sentence upon a conviction. Given the evidence already developed in the 2001 proceedings, any reasonable defense attorney would have sought a pretrial hearing on the existence of an intellectual disability. By failing to seek a pretrial hearing, Mr. Harris's attorney bypassed a risk-free opportunity to avoid the death penalty. Bypassing this opportunity constituted a deficiency in the representation.

### 3.    Prejudice Prong

Because the OCCA adjudicated the prejudice prong on the merits, the federal district court could have reached the merits of the prejudice issue only if Mr. Harris had cleared the hurdle under 28 U.S.C. § 2254(d). *See* pp. 3–5, above. Section 2254(d) prevents consideration of the merits unless the OCCA's decision on prejudice was (1) contrary to, or an unreasonable application of, clearly established federal law or (2) based on an unreasonable determination of fact in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(1)–(2).

In our view, the OCCA's decision on prejudice was based on an unreasonable factual determination, so we consider the merits.[12]

---

[12]    Given this conclusion, we need not decide whether the OCCA's decision on prejudice was contrary to, or an unreasonable application of, clearly established federal law.

18

### (a) Unreasonable Determination of Fact

Mr. Harris contends that the OCCA's decision was based on an unreasonable factual determination under 28 U.S.C. § 2254(d)(2). He points to this passage in the OCCA's decision: "All Harris's experts, including the ones who testified at his [2001] trial and competency hearing, considered these scores along with Harris's other characteristics and concluded he was not mentally retarded." *Harris v. State,* 164 P.3d 1103, 1115 (Okla. Crim. App. 2007). Mr. Harris contends that this passage reflects an unreasonable determination of fact because Dr. Krimsky had assessed an intellectual disability.[13]

The State argues that Mr. Harris failed to preserve this contention in district court by limiting his argument to Dr. Callahan's affidavit. We disagree.

To preserve the issue in district court, Mr. Harris needed only to alert the court to the issue and seek a ruling. *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1141 (10th Cir. 2007) ("An issue is preserved for appeal if a party alerts the district court to the issue and seeks a ruling."); *United States v. Harrison*, 743 F.3d 760, 763 (10th Cir. 2014) (stating that the test for specificity of an objection in district court

---

[13]     Dr. Krimsky actually used the term "mentally retarded." But in analyzing Mr. Harris's claim, we use the term "intellectually disabled." *See* note 1, above.

19

"is whether the district court was adequately alerted to the issue"). We thus consider whether Mr. Harris's argument in district court encompassed Dr. Krimsky's opinion. The State answers "no;" we answer "yes."

In district court, Mr. Harris treated Dr. Callahan's opinion as significant new evidence of intellectual disability. But Mr. Harris did not confine his argument to Dr. Callahan's opinion. Mr. Harris's argument on prejudice spanned roughly 32 pages. Within this discussion lay Mr. Harris's challenge to the OCCA's characterization of the expert opinions. Mr. Harris prefaces this discussion by explaining why the OCCA's decision was unreasonable under § 2254(d)(2). *See* Habeas Pet. at 107 ("Below is a discussion of the three (3) criteria, the impact of Dr. Callahan's report and argument why the OCCA decision was unreasonable under both prongs of §2254 (d)."). In the ensuing section, Mr. Harris extensively discusses all of the prior expert opinions on the existence of an intellectual disability.

For example, in discussing the criterion of significant sub-average intellectual functioning, Mr. Harris discusses Dr. Callahan's references to IQ tests administered by herself, Dr. Martin Krimsky, and Dr. Nelda Ferguson. Mr. Harris notes that the IQ tests by Dr. Ferguson and Dr. Krimsky would have met the state-law criterion for IQ test results below 70. And Mr. Harris underscores Dr. Krimsky's test results and assessment of mild intellectual disability:

20

> Dr. Krimsky concluded the IQ scores indicated that Mr. Harris was mildly mentally retarded. He did not believe Mr. Harris was malingering or "trying to fool the test." He again confirmed Jimmy Dean Harris "an individual with mental retardation."

*Id.* at 110 (citations omitted).

Mr. Harris also discusses the expert opinions by Dr. John Smith, Dr. Wanda Draper, and Dr. Ray Hand. In this discussion, Mr. Harris points out that Dr. Smith confirmed Dr. Krimsky's testing as an indication of intellectual disability. *Id.* at 112.

Despite this broad record-based attack on the OCCA's factual determination, the State points to two pages in which Mr. Harris discusses his reliance on Dr. Callahan's opinion. The State's reliance on these two pages disregards the other 30 pages in Mr. Harris's argument as well as the nature of Dr. Callahan's report. In this report, Dr. Callahan relied not only on her own examination and testing but also on the prior testing and diagnoses. For example, Dr. Callahan noted that Dr. Krimsky, Dr. Ferguson, and Dr. Smith had separately diagnosed Mr. Harris as having a mild intellectual disability.

The State also argues that Mr. Harris was relying solely on Dr. Callahan's opinion. We disagree. Mr. Harris addressed all of the expert witnesses, including both Dr. Krimsky and Dr. Callahan. On appeal, Mr. Harris narrows his focus to Dr. Krimsky. This narrower argument is subsumed by the broader argument that Mr. Harris had presented in district

21

court. The district court was thus alerted to Mr. Harris's appellate argument, which sufficed for preservation. *See Joseph A.* ex rel. *Wolfe v. N.M. Dep't of Hum. Servs.*, 28 F.3d 1056, 1060 (10th Cir. 1994) (concluding that the appellants had preserved their appellate argument because it had been subsumed by the argument presented in district court); *accord PCTV Gold, Inc. v. Speednet, LLC*, 508 F.3d 1137, 1144 n.5 (8th Cir. 2007) (concluding that an appellate argument was preserved because it had been encompassed in a more general argument presented in district court). Because Mr. Harris preserved the issue, we consider the merits of his challenge to the reasonableness of the OCCA's factual determination.

We conclude that the OCCA was clearly mistaken as to Dr. Krimsky. The OCCA concluded that all of the defense experts had opined that Mr. Harris was not intellectually disabled. *Harris v. State*, 164 P.3d 1103, 1115 (Okla. Crim. App. 2007). But Dr. Krimsky had opined that Mr. Harris *was* intellectually disabled.

In our appeal, the State appears to acknowledge expert testimony that Mr. Harris is intellectually disabled: "The only experts who have opined that Petitioner is mentally retarded have relied upon unreliable test results that contradict the experts' experiences with him." Appellee's Resp. Br. at 32–33. In oral argument, the State elaborates on this argument, insisting that the OCCA could reasonably reject Dr. Krimsky's test results because Mr. Harris was psychotic at the time of testing. But this was not the

OCCA's rationale. The OCCA reasoned that all defense experts had opined that Mr. Harris was not intellectually disabled, and this was simply not true of Dr. Krimsky. *Harris*, 164 P.3d at 1115.

The State also denies that the OCCA misunderstood Dr. Krimsky's opinion. The State points to a footnote where the OCCA

- noted that one expert had believed that he "had" to say that Mr. Harris's test scores indicated an intellectual disability but

- added that it "was not his conclusion" after examining Mr. Harris.

*Id.* at 1115 n.55.

The State's argument misstates the testimony. Dr. Krimsky testified that he had administered two IQ tests: (1) the Slossen Intelligence Test Revised ("SIT") and (2) the Wechsler Adult Intelligence Scale, Revised ("WAIS-R"). Mr. Harris scored a 66 on the SIT and a 68 on the WAIS-R, and Dr. Krimsky regarded these scores as proof of mild intellectual disability.

He explained that "[t]here was an ambiguity comparing the result of the first test [the SIT] . . . and [Mr. Harris's] occupation of having been involved in repair of auto transmissions." 2001 Comp. Hearing, vol. 1, at 63. But Dr. Krimsky noted that the second test [the WAIS-R] was "much more comprehensive" with "a high validity in relation to occupational and socioeconomic status." *Id.* at 64. Dr. Krimsky ultimately considered both sets of results to be consistent and accurate.

23

Dr. Krimsky also testified that Mr. Harris's mechanical skills could have been acquired by someone who was mildly intellectually disabled, pointing out that Mr. Harris had spent "a long period of time . . . observing his father and other people fix transmissions." *Id.* at 65. Given this lengthy period of observation, Dr. Krimsky opined that Mr. Harris's low IQ was consistent with his skill in fixing transmissions.

Dr. Krimsky thus testified that Mr. Harris's skills did not undermine the assessment of mild intellectual disability. In fact, Dr. Krimsky corrected an attorney who had referred to Mr. Harris as "borderline," with Dr. Krimsky repeating his characterization of Mr. Harris as having "mild mental retardation."[14] *Id.* The OCCA thus made an unreasonable factual finding that all of Mr. Harris's experts had opined that he was not

---

[14] At one point, Dr. Krimsky was asked, "[W]hat conclusions did you come to regarding [Mr. Harris's] mental state as far as his IQ and the mental retardation?" *Id.* He answered that the "mental retardation" was "incidental." *Id.* In Dr. Krimsky's view, Mr. Harris was "in a psychotic status and in need of mental health treatment, psychiatric treatment." *Id.* at 65–66. Dr. Krimsky used the term "mental state" to refer to Mr. Harris's competency and his ability to retain consistent contact with his "outer situation." *Id*. at 66–67. With respect to this mental state, Dr. Krimsky concluded that Mr. Harris was delusional and not competent, adding that Mr. Harris's competency could probably be restored within a reasonable period of time. But Dr. Krimsky did *not* testify that the delusions had affected the IQ scores or that Mr. Harris was trying to manipulate the results. Indeed, Dr. Krimsky's assessment of Mr. Harris's intellectual disability remained consistent throughout the competency hearing. In Dr. Krimsky's unchanging view, Mr. Harris had mild intellectual disability.

intellectually disabled. Dr. Krimsky was one of Mr. Harris's experts, and he specifically opined that Mr. Harris *was* intellectually disabled.

The State also argues that even if the OCCA's factual determination had been unreasonable, this factual determination had not formed the basis for the OCCA's decision. As the State points out, it is not enough for Mr. Harris to show an unreasonable factual determination; the state court's decision must have also been "based on" the unreasonable factual determination. *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011).

In our view, however, the OCCA did indeed base its decision on the unreasonable factual determination. The OCCA explained that it had found no prejudice:

> Nothing in this record shows that, had counsel made [a request for a pretrial hearing], evidence would have shown by a preponderance of the evidence that Harris was mentally retarded. There is a great deal of evidence in the record to show otherwise, *including the opinion of several experts who testified that Harris was not mentally retarded*. We cannot conclude that there was a reasonable probability that, but for counsel's omissions, the results of this resentencing proceeding would have been different.

*Harris v. State*, 164 P.3d 1103, 1116 (Okla. Crim. App. 2007) (emphasis added).[15]  By highlighting the expert opinions rejecting an intellectual

---

[15]    In assessing the evidence, the OCCA disregarded the fact that the controlling Oklahoma definition of intellectual disability was set forth in a case decided *after* the competency hearing and the first trial. *Murphy v. State*, 54 P.3d 556, 567¬68 (Okla. Crim. App. 2002), *overruled in part on other grounds by Bloomer v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). Accordingly, none of the 2001 testimony applied the controlling

disability, the OCCA suggested that this was the critical evidence on prejudice. The OCCU thus based its decision on its perception of the various expert opinions, including its mistaken perception of Dr. Krimsky's opinion.

### (b) The Need for an Evidentiary Hearing

We thus must tackle the prejudice prong in the first instance. *Magnan v. Trammell*, 719 F.3d 1159, 1175 (10th Cir. 2013). To do so, we must consider the evidence of intellectual disability.

---

standard for an intellectual disability.  We have no way of knowing what the expert witnesses would have said if they had applied the standard for an intellectual disability that governed at the time of the 2005 retrial. For example, Dr. Ray Hand testified at the first trial that Mr. Harris had exhibited "borderline intellectual functioning" but was not "mentally retarded." 2001 Tr., v. 15, at 133–34. But Dr. Hand based that conclusion in part on his view about which IQ scores were "more realistic and more representative of [Mr. Harris's] actual abilities*." Id.* at 131. In contrast, the controlling standard does not require the parties or the court to identify the more realistic or representative score. The question is instead whether the defendant has "an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligence quotient test." *Murphy*, 54 P.3d at 568. Dr. Hand did not apply this test.

Dr. Hand also testified about various deficits in Mr. Harris's adaptive functioning. But Dr. Hand was not asked whether Mr. Harris had "significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work." *Murphy*, 54 P.3d at 568.

Mr. Harris contends that a pretrial hearing could have led to a finding of intellectual disability, pointing to his history of IQ testing, Dr. Callahan's report, expert testimony, and evidence of difficulties in adaptive functioning. In response, the State focuses on Mr. Harris's older IQ tests, the testimony of other experts, and Mr. Harris's employment history.

The issue of prejudice turns on whether a reasonable factfinder could find an intellectual disability. With this issue hotly disputed and the lack of a factual finding, the district court could not grant habeas relief. *See Littlejohn v. Trammell*, 704 F.3d 817, 856 (10th Cir. 2013) (stating that even though counsel's conduct may have been prejudicial, the court could not grant habeas relief "[a]t this juncture" because the persuasiveness of particular expert testimony was disputed and the claim was "highly fact-bound").

Nor could the district court deny habeas relief, for no factfinder has considered Mr. Harris's evidence of intellectual disability based on the Oklahoma test that applied during Mr. Harris's retrial. Without a factual finding based on the applicable test, a court could not properly assess the extent of the prejudice.

To decide the issue of prejudice, the district court needed to assess the likelihood that defense counsel could have proven the existence of an intellectual disability. Like us, the district court had only a cold record

containing conflicting evidence on Mr. Harris's intellectual status. Dr. Krimsky assessed an intellectual disability; Dr. Callahan assessed borderline intellectual functioning; and Dr. Draper considered Mr. Harris to be intellectually impaired but not intellectually disabled.[16]

No court has had the opportunity to hear these experts testify and apply the Oklahoma test on intellectual disability. If these experts had testified in a pretrial hearing focused on that test, which experts would have swayed the factfinder? To provide at least a meaningful prediction, a court must at least hear the conflicting evidence, apply Oklahoma's test for an intellectual disability, and determine which expert witnesses to believe. *See Smith v. Sharp*, 935 F.3d 1064, 1077 (10th Cir. 2019) (stating that "*Atkins* clearly establishes that intellectual disability must be assessed, at least in part, under the existing clinical definitions applied through expert testimony" and recognizing "the centrality of expert testimony to our review of *Atkins* verdicts"). No court has engaged in this scrutiny, so any court would need an evidentiary hearing to predict the outcome of a pretrial hearing on an intellectual disability.

---

[16] Dr. Hand and Dr. Smith supplied other assessments. Dr. Hand did not believe that Mr. Harris was mentally retarded (under his definition of mental retardation) but thought that he had "mixed specific learning disabilities" and was likely "slow" or had "borderline intellectual functioning." 2001 Tr., v. 15, at 133–34. And Dr. Smith believed that Mr. Harris had "normal intelligence." Comp. Hearing, v. 1, at 215.

We addressed a similar situation in *Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013). There we concluded that the availability of habeas relief turned on a disputed factual issue that prevented a meaningful decision based on the cold record alone. *Littlejohn*, 704 F.3d at 856. We directed the district court to conduct an evidentiary hearing on the issue of prejudice. *Id.* Here we have the same need for an evidentiary hearing.

An evidentiary hearing is ordinarily unavailable when the petitioner failed to diligently develop the factual bases of the claim in state court. *Williams v. Taylor*, 529 U.S. 420, 432 (2000).[17] Here, however, Mr. Harris diligently tried to develop the factual foundations of his claim when he was in state court. For example, he argued that his trial counsel had failed to seek a pretrial hearing on intellectual disability. With this argument, Mr. Harris requested an evidentiary hearing and supported the request with Dr. Callahan's affidavit. The OCCA denied this request.

---

[17]     Exceptions exist when the habeas claim is based on

- a new constitutional rule that the Supreme Court has made retroactive on collateral review or

- a factual predicate not reasonably discoverable earlier through reasonable diligence, along with clear and convincing evidence showing that no reasonable factfinder would have found guilt without the constitutional error.

28 U.S.C. § 2254(e)(2)(A)(i)–(ii).

Mr. Harris did all that he could to develop the factual foundation for a showing of prejudice. By denying the opportunity for an evidentiary hearing, the OCCA left us with only a cold record and no factual findings for the innately fact-intensive issue of prejudice.

Because Mr. Harris was diligent, we consider whether Mr. Harris's proof of allegations would entitle him to habeas relief. *See Hammon v. Ward*, 466 F.3d 919, 927 (10th Cir. 2006). That inquiry turns on the issue of prejudice. Defense counsel's deficient performance would be prejudicial if a pretrial hearing would create a reasonable probability of a lesser sentence. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Mr. Harris argues that if his trial attorney had requested a pretrial hearing, the trial court would have granted the request and found Mr. Harris intellectually disabled, rendering him ineligible for execution. We thus gauge the likelihood that the state court would have found an intellectual disability.

As noted, the Supreme Court has prohibited the execution of intellectually disabled individuals, but allowed the states to define the term "intellectual disability." *Atkins v. Virginia*, 536 U.S. 304, 317 (2002). When Mr. Harris appealed his conviction, Oklahoma law required a defendant to show at least one IQ score under 70. *Murphy v. State*, 54 P.3d 556, 567–68 (Okla. Crim. App. 2002), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). If the

30

defendant produced at least one score under 70, he or she would need to satisfy three elements:

1. The person "functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others."

2. The disability "manifested itself before the age of eighteen."

3. The disability "is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work."

*Id.*; *see* p. 8, above.

Mr. Harris's counsel could have satisfied the threshold requirement for at least one IQ score below 70. And the State does not challenge the second element (manifestation before the age of eighteen). The dispute exists on the first and third elements, which address Mr. Harris's intellectual and adaptive deficits.

Mr. Harris's evidence on intellectual deficits involves three categories:

1. his history of IQ testing,

2. the testimony of an expert witness, and

3. the affidavit of an expert witness.

First, Mr. Harris's IQ testing began in his childhood. Two childhood IQ tests yielded scores of 87 and 83. After the murder, new IQ tests

31

yielded scores of 63, 66, 68, and 75. And after Mr. Harris's retrial, Dr. Jennifer Callahan tested Harris's IQ and obtained scores ranging from 67–75 and 72–77.

| Date | Type of Test | By | Score |
|---|---|---|---|
| 1964 | Stanford-Binet Revised | Dr. Teresa Costiloe at University of Oklahoma Hospital | 87 |
| 1964 | WISC | Dr. Teresa Costiloe at University of Oklahoma Hospital | 83 |
| The Murder | | | |
| Oct. 20, 2000 | WAIS-III | Dr. Nelda Ferguson | 63 |
| March 8, 2001 | SIT-R | Dr. Martin Krimsky | 66 |
| March 21, 2001 | WAIS-R | Dr. Martin Krimsky | 68 |
| July 20, 2001 | WAIS-III | Dr. Elizabeth Grundy at Eastern State Hospital | 75 |
| Sentencing, Resentencing, and Direct Appeal | | | |
| March 13, 2006 | WASI-I | Dr. Jennifer Callahan | 67–75 |
| March 13, 2006 | Woodcock-Johnson III | Dr. Jennifer Callahan | 72–77 |

Second, Mr. Harris points to Dr. Krimsky's testimony about his two IQ tests. Dr. Krimsky testified in the 2001 competency hearing, explaining that his testing showed "mild mental retardation." *See* 2001 Comp. Hearing, v. 1, at 58. When asked whether Mr. Harris's occupation was

consistent with borderline intellectual disability, Dr. Krimsky corrected the attorney, pointing out that Mr. Harris was "not borderline" and reiterated that he had "mild mental retardation." *Id.* at 65.

Third, Mr. Harris points to an affidavit and report by Dr. Callahan, who concluded that Mr. Harris's IQ fell in the "impaired to borderline impaired range." R. at 287. On one test, Mr. Harris's scaled score was 67–75; on another test, the scaled scored was 72–77, which Dr. Callahan said would approximate the mental status of a child only 6 years and 10 months old. Dr. Callahan explained the disparity in Mr. Harris's IQ scores, concluding that "greater consistency" existed in the scores than "one may appreciate initially" because IQ is ideally viewed as a range and IQ scores change over time based on a phenomenon known as the "Flynn effect." *Id.* at 288.

The Flynn effect is designed to account for two facts:

1. IQ tests measure intelligence relative to the contemporaneous general population, not as an absolute number.

2. IQ scores tend to increase over time.

Given these two facts, an older IQ test would typically yield a higher figure than a more recent test for the same individual. For example, Mr. Harris took one of the IQ tests in 1964. By the time of Mr. Harris's test, the grading scale was roughly fifteen years old. So Dr. Callahan lowered Mr. Harris's score from 83 +/- 5 to 75.5 +/- 5.

Dr. Callahan concluded that her findings indicated "borderline intellectual functioning," but she acknowledged that Mr. Harris's cognitive abilities were "not uniformly at this level." *Id.* at 289.[18]

Mr. Harris also presented six forms of evidence involving adaptive deficits:

1.  Dr. Callahan's testing showed adaptive strengths, including Mr. Harris's "visual-spatial thinking abilities," which explained how he could work. But his "relative weakness[es]" included the inability to quickly process information, difficulty in learning and recalling new information, and impairment in his ability to "plan and organize." *Id.* at 289–90.

2.  Mr. Harris had a history of poor academic performance. Even with tutors, he dropped out of high school and experienced problems in recognizing words, spelling, and doing mathematics. These problems led Dr. Callahan to regard Mr. Harris as functionally illiterate, with abilities approximating those of a first or second grader.

3.  Though Mr. Harris worked as a mechanic, he was "slow" and his wife needed to read the technical manuals and call hotlines for help. 2005 Tr., v. 5, at 55–56, 58, 157.

4.  A former employer testified about difficulty in communicating with Mr. Harris, stating that "[h]e would start one sentence and end it with a different sentence." 2001 Tr., v. 12, at 28–29.

5.  Mr. Harris engaged in very risky behavior as a child and teen, leading to injuries.

6.  Mr. Harris had a lifelong addiction to alcohol and narcotics, showing difficulties in self-care (a feature of adaptive functioning).

---

[18]  Dr. Callahan added that Mr. Harris was not malingering.

This combination of evidence could lead to a reasonable finding that Mr. Harris had satisfied the first and third elements of an intellectual disability (impairments in intellectual and adaptive functioning).

The State disagrees, relying on Mr. Harris's childhood IQ tests and employment history. But the tests and employment history invoked by the State are controverted by

1.  Dr. Callahan's discussion of the Flynn effect, which would contextualize the IQ scores stressed by the State,

2.  expert testimony that an intellectual disability would not necessarily prevent work as a mechanic, and

3.  OCCA decisions in other cases stating that similar evidence of adaptive functioning and borderline intellectual functioning did not preclude relief.[19]

Thus, proof of Mr. Harris's allegations would support the finding of an intellectual disability. Given the potential for this finding, a habeas court could view defense counsel's failure to request a pretrial hearing as prejudicial.

Ultimately, however, we cannot accurately resolve the dispute over the first and third elements of an intellectual disability. Mr. Harris and the

---

[19] For example, in *Pickens v. State*, 126 P.3d 612 (Okla. Crim. App. 2005), the OCCA concluded that a petitioner was intellectually disabled as a matter of law when his IQ testing indicated borderline intellectual functioning and showed some ability to function adaptively. 126 P.3d at 618–20.

State point to evidentiary disputes on these elements, and these disputes have not been presented to a factfinder for resolution under Oklahoma's test for an intellectual disability. So a decision on the prejudice prong should await an evidentiary hearing in district court. *See* p. 29, above (discussing *Littlejohn v. Trammell*, 704 F.3d 817, 856–57 (10th Cir. 2013)); *accord Sasser v. Hobbs*, 735 F.3d 833, 850 (8th Cir. 2013) (concluding that "misconceptions about the Arkansas legal standard [for identifying an intellectual disability] led the district court to answer the wrong factual questions, leaving the pertinent questions unanswered" and that "[t]he proper course . . . [was] to vacate the district court's finding that [the defendant] [was] not mentally retarded and remand so that the district court [could] answer the critical factual questions in the first instance according to the correct legal standard"); *Allen v. Buss*, 558 F.3d 657, 663 (9th Cir. 2009) (observing that "the [state] trial court did not determine whether [the petitioner] is mentally retarded under Indiana's test for mental retardation" and remanding the case to the federal district court for an evidentiary hearing).

**(c)    Conclusion**

Engaging in de novo review, we conclude that Mr. Harris has

- shown a deficiency in defense counsel's performance and

- alleged a theory of prejudice that, if true, could justify habeas relief.

Although factual disputes preclude us from deciding the issue of prejudice, Mr. Harris is entitled to an evidentiary hearing. We thus remand for an evidentiary hearing as to prejudice. At this hearing, the parties should be able to present expert testimony on whether Mr. Harris satisfied Oklahoma's test for an intellectual disability. *Smith v. Sharp*, 935 F.3d 1064, 1077 (10th Cir. 2019) (noting our prior recognition of "the centrality of expert testimony to our review of *Atkins* verdicts").

## C. Failure to Adequately Present Mitigation Evidence

The Supreme Court has recognized that attorneys in death-penalty cases are ineffective if they bypass evidence that might have altered the jury's selection of a penalty. *Williams v. Taylor*, 529 U.S. 362, 398 (2000). Mr. Harris invokes this case law, arguing that his attorney failed to adequately present mitigation evidence on intellectual impairments and mental illness.

Mr. Harris's arguments encompass evidence that would show not only an intellectual disability but also lesser intellectual impairments that the jury could regard as mitigating. Mr. Harris also points to evidence of other mental illnesses.[20]

---

[20]    We consider three categories of mitigating evidence. The first is an "intellectual disability," meaning evidence that meets the Oklahoma test at the time of the 2005 retrial. The second is "borderline intellectual functioning," which consists of lesser cognitive and adaptive impairments that might be mitigating. *See* 2001 Tr., v. 15, at 133–36 (testimony of Dr.

37

**1.      The Legal Standard and the Standard of Review**

For these arguments, we consider whether the OCCA unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984). To assess prejudice, we must evaluate the totality of the evidence, including

1.      the aggravating circumstances found by the jury,

2.      the mitigation evidence,

3.      the mitigation evidence that might have been introduced, and

4.      "what the prosecution's response to that evidence would have been."

*Littlejohn v. Royal*, 875 F.3d 548, 553 (10th Cir. 2017), *cert. denied*, 139 S. Ct. 102 (2018). Applying both prongs of *Strickland* (deficiency and prejudice), the OCCA rejected the mitigation-related claims on the merits.[21] *Harris v. State,* 164 P.3d 1103, 1118 (Okla. Crim. App. 2007). We thus apply the standard set out in 28 U.S.C. § 2254(d). *See* pp. 3–4, above.

**2.      Intellectual Impairment as a Mitigating Factor**

Mr. Harris argues that his attorney performed deficiently by calling only one expert witness (Dr. Draper) to testify about an intellectual

---

Hand). The third category consists of other mental illnesses that might be mitigating.

[21]      Mr. Harris insists that the OCCA's denial of an evidentiary hearing could not have constituted a denial on the merits. But as we explain above, this argument is based on a misunderstanding of Oklahoma law. *See* pp. 11–13, above.

impairment involving either an intellectual disability or borderline intellectual functioning. According to Mr. Harris, his attorney should have presented better mitigation evidence of an intellectual impairment. In our view, however, the OCCA acted reasonably in rejecting this claim based on a failure to show either deficient performance or prejudice.

**(a)  Evidence of Intellectual Impairments**

In the 2005 retrial, defense counsel presented testimony by seven of Mr. Harris's family, friends, and associates. But Mr. Harris's attorney called only one expert witness, Dr. Wanda Draper. Dr. Draper was not an expert in intellectual impairments; her expertise instead involved development, an interdisciplinary field involving psychology, sociology, and other disciplines. She testified mainly about Mr. Harris's "life path," which included his childhood, education, and personal relationships. 2005 Tr., v. 5, at 35.

Some of Dr. Draper's testimony concerned Mr. Harris's intellectual impairments. For example, Dr. Draper testified that Mr. Harris had "[p]oor [s]chool [p]erformance," was "[s]low [i]n school," had an IQ score in the 80s, suffered from "[d]yslexia," had a "[c]ompulsive personality," and experienced a "[p]erception disorder." Def. Exh. 2. Dr. Draper added that (1) Mr. Harris's dyslexia had impeded his ability to read and write and (2) he had suffered from a "perception disorder," which led to compulsiveness and an inability to see things in perspective. 2005 Tr., v. 5, at 43.

39

Dr. Draper explained that Mr. Harris "was not retarded, but he was slow and he had to do things very slowly and with help." *Id.* at 58. According to Dr. Draper, the need to act slowly rendered him dependent on Pam. Dr. Draper also explained the unevenness in Mr. Harris's IQ test results:

> Q: [H]e was given IQ tests, for lack of a better term, intelligence test, after the fact, after he was arrested.
>
> A: Right.
>
> Q: And there was a scatter in those IQ tests?
>
> A: Yes, they were relatively low, but there was a scatter. And because he had what we would call high level of spatial and visual intelligence he was able to do that transmission work. He had good eye/hand coordination. And he was able to look at a three-dimensional object and figure how it goes together in a car. And all of that comes from a pretty high level of spatial intelligence. But his other intelligences were much lacking.

*Id.* at 68. On cross-examination, Dr. Draper supplied greater detail about Mr. Harris's history of intelligence testing:

> [W]hen he was tested during his early school years it was low/normal IQ, I believe, in the low 80s as a full scale. And it was only later, after the fact, after the incident, I think he was given a battery of tests by several different examiners and he was found to have an IQ that ranged from the 60s to the 80s.

*Id.* at 133.

Both sides presented closing arguments on Mr. Harris's intellectual functioning. In their arguments, the prosecutors acknowledged that Mr. Harris had a low IQ, but questioned the reliability of Dr. Draper's

40

testimony about past IQ tests. The prosecutors also pointed out that another expert witness had opined that Mr. Harris was malingering and told the jury:

> Who ever told you that he had a low IQ and that made it difficult for him to solve problems? He can solve problems. He just doesn't solve them in a way that we think is appropriate. Jimmy Dean Harris doesn't have any problem with the way he solves problems. It's the rest of us that need to fear him for his problem-solving abilities.

2005 Tr., v. 6, at 935.

The defense countered with Dr. Draper's testimony. Defense counsel urged the jury to focus on

> [t]he images of a kid who falls behind in school because he just can't read. He's got dyslexia, but he's also close to mentally retarded. We don't have an exact number, but Dr. Draper testified that 75 was the best consensus of all the numbers that she looked at in the 60 hours that she prepared, talking to everybody in this case, looking into his life.

*Id.* at 944. The attorney later emphasized Mr. Harris's "75 IQ and real lack of problem-solving skills," noting that Dr. Draper had "talked about [how] a person with a little better makeup, a little better development," would have been able to navigate the marital conflict without resorting to murder. *Id.* at 960.

### (b) Mitigation Evidence Involving an Intellectual Disability

On appeal, Mr. Harris argues that his trial counsel was ineffective in failing to present mitigation evidence involving both an intellectual disability and borderline intellectual functioning. But in the OCCA, Mr.

41

Harris did not argue that defense counsel should have presented mitigation evidence involving an intellectual disability.

In briefing the issue to the OCCA, defense counsel was specific, confining his argument to mitigation evidence involving borderline intellectual functioning. In making this argument, defense counsel considered intellectual disability an issue that could be addressed only in a pretrial hearing. If the defendant prevailed, he would be ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). If the defendant lost on this issue, defense counsel apparently assumed that he would have been barred from urging mitigation based on an intellectual disability. *Cf. Blonner v. State*, 127 P.3d 1135, 1144 (Okla. Crim. App. 2006) (stating that if the pretrial hearing results in a finding of no intellectual disability, "[t]he issue of mental retardation shall not be relitigated at the capital first degree murder trial").[22]

Defense counsel thus acknowledged that he was not alleging a failure to present additional mitigation evidence involving "mental retardation." He was instead confining the argument to additional evidence of a lesser intellectual impairment that he called "borderline mental retardation,"

---

[22]   At oral argument, Mr. Harris contends the opposite, insisting that he could have urged mitigation based on an intellectual disability even if the state trial court had found no intellectual disability as a bar to execution. But the OCCA did not have the benefit of this argument. In the OCCA, Mr. Harris had disclaimed any argument that he could relitigate the existence of an intellectual disability at the penalty phase.

42

presumably a synonym for Dr. Callahan's preferred term "borderline intellectual functioning":

> Appellant is not here claiming only to be borderline mentally retarded – his claim of mental retardation is addressed in Proposition I. However, given the procedural posture of this case, counsel could not have argued that Mr. Harris was mentally retarded since the mentally retarded are exempt from the death penalty. If counsel had simply taken the previous testimony at face value and not conducted an independent investigation into Mr. Harris' mental deficiencies, then he would have had overwhelming evidence that Mr. Harris was borderline mentally retarded. On the other hand, had defense counsel independently investigated his client's mental condition and determined that a sufficient basis existed for a jury determination of the mental retardation issue, it is likely that such a hearing would have been held. In such a case, either Mr. Harris would have been determined to be retarded, or not, by a jury. In this scenario, counsel would have argued borderline mental retardation because had a jury determined Mr. Harris to be mentally retarded, then there would have been no capital sentencing at all.

Appellant's Opening Br. at 16–17 n.15, No. D-2005-117 (Okla. Crim. App. May 18, 2006).

Given Mr. Harris's framing of the issue, the OCCA never referred to an issue involving an intellectual disability. *See Strelecki v. Okla. Tax Comm'n*, 872 P.2d 910, 925 n.1 (Okla. 1993), *clarified on reh'g* (Okla. Mar. 23, 1994) ("[C]ourts are not free to act as advocates and to raise claims that should be raised by the parties."). The court instead referred to "diminished mental capacity," presumably as a synonym for defense counsel's term "borderline mental retardation" or Dr. Callahan's preferred term "borderline intellectual functioning." So the OCCA addressed only

43

the lack of mitigation evidence involving borderline intellectual functioning (not an intellectual disability).

Mr. Harris's failure to present the OCCA with his current argument would ordinarily constitute nonexhaustion of state-court remedies. *See* 28 U.S.C. § 2254(b)(1)(A). But exhaustion is unnecessary when it would be futile. *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011). And exhaustion now would be futile because the OCCA would undoubtedly consider the claim waived. *See Slaughter v. State,* 105 P.3d 832, 833 (Okla. Crim. App. 2005).[23] Mr. Harris's claim is thus subject to a procedural default,[24] and consideration of the merits would be available only if Mr. Harris shows cause and prejudice. *Banks v. Workman*, 692 F.3d 1133, 1144 (10th Cir. 2012). Because Mr. Harris cannot show cause and prejudice, we apply an anticipatory procedural bar and decline to consider this claim. *See Pavatt v. Carpenter*, 928 F.3d 906, 924 (10th Cir. 2019) (en banc) (holding that the habeas petitioner's appellate argument was subject

---

[23]    Mr. Harris has already pursued a direct appeal and post-conviction proceedings in which he could have (but failed to) raise this argument.

[24]    The State contends that even if the claim is unexhausted, the court could deny relief on the merits under the AEDPA. It's true that unexhausted claims can be denied on the merits. 28 U.S.C. § 2254(b)(2). But if the OCCA had not decided the claim on the merits, the AEDPA would not apply. *See* pp. 3–4, 10, above.

to an anticipatory procedural bar because the argument had not been fairly

presented to the OCCA).[25]

### (c) Mitigation Evidence Involving Borderline Intellectual Functioning

We also reject Mr. Harris's claim that his counsel was ineffective in

presenting mitigation evidence on borderline intellectual functioning.

### i. The OCCA's Reliance on Both Prongs (Deficient Performance and Prejudice)

On this claim, the OCCA concluded that Mr. Harris had not shown

either deficient performance or prejudice. *Harris v. State*, 164 P.3d 1103,

1116–18 (Okla. Crim. App. 2007). On the prong of deficient performance,

the court

- noted that counsel had presented some evidence that involved intellectual impairments,

- discussed the virtually unchallengeable nature of strategic decisions, and

- concluded that defense "[c]ounsel's choice of mitigating evidence did not amount to ineffective assistance."

---

[25] Mr. Harris contends that the State failed to preserve its current argument that defense counsel had not acted deficiently in failing to urge mitigation based on an intellectual disability. But we ordinarily consider an appellee's arguments for affirmance even if they had not been presented in district court. *See United States v. Mosley*, 743 F.3d 1317, 1324 & n.2 (10th Cir. 2014) (considering an argument for affirmance made by the government for the first time on appeal even though the argument conflicted with the government's position in district court); *see also United States v. Bagley*, 877 F.3d 1151, 1154 (10th Cir. 2017) ("Though the government did not raise this argument in district court, we can affirm on alternative grounds when the district court record is adequately developed.").

*Id.* at 1103, 1116, 1118. In this discussion, the OCCA rejected the claim at least partly based on Mr. Harris's failure to show a deficiency in the representation.

On the prejudice prong, the OCCA referred to Mr. Harris's argument "that that the prejudice from this decision is evident." *Id.* at 1118. The OCCA rejected this argument, finding that the jurors at the retrial had chosen the death sentence even after hearing some of this mitigating evidence. *Id.*

### ii. Deficient Performance

Mr. Harris claims that defense counsel should have presented additional mitigation evidence on his borderline intellectual functioning. For this claim, Mr. Harris argues that the OCCA made an unreasonable determination of fact under § 2254(d)(2). According to Mr. Harris, the OCCA unreasonably found that Mr. Harris's attorney had strategically chosen to bypass additional mitigation evidence. Mr. Harris argues that if his attorney had conducted a reasonable investigation, he would have learned of the evidence presented in the 2001 proceedings and would have used a better expert witness to explain the evidence of borderline intellectual functioning. The OCCA concluded that trial counsel's performance was neither deficient nor prejudicial. *Harris v. State*, 164

P.3d 1103, 1116–18 (Okla. Crim. App. 2007). These conclusions were reasonable under § 2254(d)(2).

We begin with the OCCA's determination that defense counsel's selection of evidence had been strategic. Mr. Harris argues that the OCCA made an unreasonable factual determination because the state-court record shows that defense counsel had not made a strategic decision. For this argument, Mr. Harris states that

- nothing in the record supported the OCCA's determination that Mr. Harris's attorney had made a strategic decision and

- after the penalty phase in the 2005 retrial, the attorney continued to list Mr. Harris's low IQ and inadequate problem-solving skills as mitigating factors.

But we do not regard a factual finding as unreasonable if "'[r]easonable minds reviewing the record might disagree' about the finding in question." *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (alteration in original)).

Reasonable minds could conclude that Mr. Harris's attorney had strategically decided how to present the evidence. For example, the record indicated that the attorney was aware of the evidence that had been presented in the state-court proceeding. In a colloquy with the judge, the attorney said: "I'm not calling any shrinks, I'm not calling any psychiatrists or all of the other people that testified last time." 2005 Tr., v.

5, at 150. The OCCA could reasonably infer from this testimony that defense counsel

- had known of the evidence in the 2001 trial and

- had deliberately declined to present additional evidence of intellectual deficiencies.

*See Wood v. Allen*, 558 U.S. 290, 301–02 (2010) (holding that evidence that counsel had known about omitted evidence and chosen not to present it to a jury could "fairly be read to support" the state court's judgment that counsel had acted strategically).[26]

In the alternative, Mr. Harris argues that even if the OCCA had reasonably found that counsel acted strategically, this strategy would not have involved a reasonable investigation. This argument fails because the OCCA reasonably applied Supreme Court decisions in finding that defense counsel had not performed deficiently. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003).

To assess this argument, we consider the investigation underlying the strategy. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Mr. Harris argues that the investigation was unreasonable because the attorney had

---

[26] Mr. Harris also incorporates other arguments regarding an unreasonable determination of fact. These arguments are addressed elsewhere. For instance, Mr. Harris's other arguments about the scope of the investigation are better understood as arguments for reversal under 28 U.S.C. § 2254(d)(1); we thus consider these in our discussion of Mr. Harris's arguments under § 2254(d)(1).

- known of evidence, presented in the 2001 trial, that Mr. Harris was intellectually disabled and

- engaged Dr. Draper (instead of another expert witness with better qualifications) to discuss intellectual impairments.

The OCCA concluded that Mr. Harris's attorney had decided not to highlight the diagnoses and testing, choosing to focus instead on Mr. Harris's development throughout his life. *Harris v. State*, 164 P.3d 1103, 1118 (Okla. Crim. App. 2007). This conclusion was supported by the record: Dr. Draper testified about Mr. Harris's intellectual development and his IQ testing. And in closing argument, defense counsel emphasized Dr. Draper's testimony about Mr. Harris's overall development. Counsel used that testimony to argue that an adult with greater development would not have committed the murder.

This was not a case in which an attorney failed to investigate or present any mitigation evidence on intellectual impairments. Rather, the defense attorney pursued a strategy focusing on childhood development rather than Mr. Harris's mental state after the crime. And in implementing this strategy, the attorney used a witness with expertise in personal development. Applying the deferential AEDPA standard, we conclude that defense counsel's performance fell within the broad range of acceptable strategies. *See Doyle v. Dugger*, 922 F.2d 646, 652 (11th Cir. 1991) (concluding that defense counsel was not deficient for presenting only some of the available evidence about the defendant's mental state).

49

### iii. Prejudice

Mr. Harris urges prejudice from his attorney's failure to call an expert on intellectual impairments, focusing on the "inherently mitigating" nature of evidence of intellectual impairments when the death penalty is at stake. Supp. Mem. Br. of Petitioner at 8 (quoting *Tennard v. Dretke*, 542 U.S. 274, 287 (2004)). The OCCA found no prejudice from defense counsel's failure to present additional mitigation evidence involving borderline intellectual functioning. This finding was based on a reasonable determination of facts and Supreme Court precedent.[27]

We addressed an analogous issue in *Grissom v. Carpenter*, 902 F.3d 1265 (10th Cir. 2018). In *Grissom*, the petitioner claimed that his trial attorneys had been ineffective by failing to investigate and present evidence of organic brain damage because of "red flags" pointing to a potentially fruitful defense on mitigation. 902 F.3d at 1272–73. We affirmed the denial of habeas relief, explaining that the petitioner could not show prejudice partly because his attorney had already presented a

---

[27] We assume, for the sake of argument, that other evidence of intellectual impairments would have been mitigating. In *Tennard v. Dretke*, the Supreme Court recognized the inherently mitigating nature of evidence involving intellectual impairments. 542 U.S. 274, 287 (2004). But in *Atkins v. Virginia*, the Supreme Court noted that "reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." 536 U.S. 304, 321 (2002). That risk was arguably present here because the State had alleged an aggravating circumstance of future dangerousness.

50

robust mitigation case and the omitted report had "largely reflect[ed] the mitigating narrative already presented at trial." *Id.* at 1279 (quoting *Grissom v. State*, 53 P.3d 969, 995 (Okla. Crim. App. 2011)).

This explanation is equally fitting here. Although a cognition expert might have better emphasized the extent of an intellectual impairment, defense counsel did not present the kind of "paradigmatic halfhearted mitigation case" that we've regarded as constitutionally defective. *Littlejohn v. Royal*, 875 F.3d 548, 563 (10th Cir. 2017), *cert. denied*, 139 S. Ct. 102 (2018). Instead, defense counsel presented seven fact witnesses who testified about

- Mr. Harris's need for Pam's help in reading technical information, doing paperwork, and calling hotlines,

- Mr. Harris's difficulties in school because he was a slow learner,

- Mr. Harris's dependable work,

- verbal combat between Mr. Harris and Pam,

- Pam's berating of Mr. Harris,

- childhood suffering of parental abuse, and

- Mr. Harris's loving relationship with his siblings and daughters.

Defense counsel also presented Dr. Draper, who testified that Mr. Harris was "slow," had trouble in school, and needed help in working and functioning in society. 2005 Tr., v. 5, at 58. Dr. Draper added that Mr.

51

Harris's IQ scores were low, reflecting a high visual and spatial intelligence that facilitated work as a transmission mechanic despite shortcomings in other intellectual abilities. *Id.* at 68.

This testimony was not qualitatively different than Dr. Callahan's affidavit. Dr. Callahan assessed Mr. Harris's intellectual status as "borderline intellectual functioning." R. at 289. And like Dr. Draper, Dr. Callahan explained that Mr. Harris had strengths that allowed him to work despite his intellectual deficits.

In closing argument, defense counsel also used Dr. Draper's testimony to emphasize Mr. Harris's low intellectual ability and poor problem-solving skills. Given the evidence and closing argument, the OCCA could reasonably attribute little value to additional mitigation evidence on borderline functioning. We thus conclude that the OCCA reasonably applied Supreme Court precedents in finding no prejudice from the failure to present greater evidence of borderline intellectual functioning.

**(d) Mitigation Evidence Involving Mental Illness[28]**

Mr. Harris also argues that his attorney was ineffective by failing to

- call an expert witness specializing in mental health,

---

[28] As noted above, we use the term "mental illness" to refer to various cognitive and behavioral deficits not included in the other categories of intellectual impairments (intellectual disability and borderline intellectual functioning). *See* note 20, above.

- highlight diagnoses of mental illness, and

- show how mental illness might have contributed to the murder.

According to Mr. Harris, these shortcomings were prejudicial because the additional evidence might have convinced at least one juror to vote for life in prison rather than the death sentence. We reject this argument.

### i.    Mental-Health Evidence in the 2005 Retrial

At the 2005 retrial, defense counsel presented some evidence of mental-health problems. But Mr. Harris argues that defense counsel should have presented additional evidence from the 2001 trial and the competency hearing.

At the 2005 retrial, defense counsel urged mitigation based on Mr. Harris's mental condition, alcoholism, drug abuse, and strong emotions. But defense counsel did not call an expert witness specializing in mental health; most of the evidence involving these mitigating factors came from Dr. Draper.

Dr. Draper testified about three facets of mitigation:

1.    When Mr. Harris had been a child, he suffered parental abuse and saw his father abuse his mother.

2.    As a teenager, Mr. Harris had obtained narcotics and alcohol from his father, which led to a lifelong pattern of substance abuse.

3.    Mr. Harris had tried to commit suicide.

Dr. Draper added that eight to ten other doctors had found "serious psychological problems":

> Q: You have been given various psychological tests that have been administered to Jimmy Dean Harris over the years. Have there been reports in there of any mental illnesses?
>
> A: Well, there were. This was -- I think these were tests that were administered after the incident.
>
> Q: And approximately how many different doctors?
>
> A: Well, there were probably eight or ten. I listed those in my report; although, I did not pursue that area with any diligence because that was after the fact. The significance of that is all of those found that he had some serious psychological problems.

2005 Tr., v. 5, at 67–68. Dr. Draper also testified that Mr. Harris was taking medication to control his mental illness:

> Q: And have you seen any records of medications given to him in the jail?
>
> A: Yes. I think he's taking some psychotropic drugs and some other medications for general health problems.
>
> Q: And you're not a physician, but you do know that the drugs are for controlling mental illness?
>
> A: Yes.

*Id.* at 68–69.

### ii. Other Existing Evidence of Mr. Harris's Mental Illness

In the prior proceedings, counsel for both parties elicited additional evidence of Mr. Harris's mental illness.

For example, Dr. John Smith testified that before the murder, Mr. Harris had suffered from bipolar II disorder with psychosis. But Dr. Smith conceded that it was difficult to pinpoint when Mr. Harris had experienced the effects of drugs and alcohol.

An expert witness for the prosecution testified that Mr. Harris had

- suffered from a major depressive episode with associated psychotic features and

- stabilized through medication.

And a jail counselor diagnosed Mr. Harris with schizo-affective disorder. Dr. Smith and the jail counselor described Mr. Harris after the murder as erratic, delusional, psychotic, and suicidal.

Other evidence suggested that Mr. Harris was responsive to medication. Dr. Smith described these medications and opined that they had helped, allowing Mr. Harris to attend the trial and testify with focus.

### iii.    Claim of Ineffective Assistance of Counsel

Mr. Harris argues that defense counsel was ineffective for failing to call a mental-health expert and present this evidence in the penalty phase. The OCCA rejected this claim without specifying whether the court was relying on (1) the failure to show deficient representation or (2) prejudice. *Harris v. State*, 164 P.3d 1103, 1116–19 (Okla. Crim. App. 2007). Given

this ambiguity, we apply 28 U.S.C. § 2254(d) on both prongs (deficient performance and prejudice). *Premo v. Moore*, 562 U.S. 115, 123 (2011).[29]

### a. Deficiency Prong

Mr. Harris contends that the OCCA unreasonably determined the facts and applied Supreme Court precedents.

### (i) Unreasonable Factual Determinations

Mr. Harris argues that the OCCA based its decision on two unreasonable determinations of fact:

1. that defense counsel had presented evidence of a mental illness and

2. that defense counsel had strategically decided to downplay the evidence of mental illness.

We reject both arguments.

Mr. Harris first points out that the OCCA said that "[w]hile Harris's specific diagnoses of mental illness [had not been] presented to the jury," jurors had been told that he was diagnosed as mentally ill. *Harris v. State*,

---

[29] On this claim, Mr. Harris contends that the district court should have conducted an evidentiary hearing. But the reasonableness of the OCCA's conclusion must be based on the existing state-court record. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (stating that habeas review under § 2254(d)(2) is also confined to the record in state court). Thus, the district court could not consider evidence newly presented in federal court to determine whether the OCCA had unreasonably applied federal law or determined the facts.

164 P.3d 1103, 1118 (Okla. Crim. App. 2007). According to Mr. Harris, this statement constituted an unreasonable determination of fact because the State had denied the existence of any evidence of a mental illness.

We reject Mr. Harris's argument. The OCCA observed that the jury "had been told" of a diagnosis. *Id.* This observation was accurate, for Dr. Draper had testified about a prior diagnosis of "serious psychological problems." 2005 Tr., v. 5, at 67–68; *see* p. 54, above. The OCCA's statement was thus reasonable based on the evidence presented.

The OCCA also stated that defense counsel had strategically decided to downplay the evidence of mental illness. Mr. Harris argues that this statement entailed an unreasonable factual determination. *See* 28 U.S.C. § 2254(d)(2). For this argument, he points to three facts:

1. Defense counsel asked Dr. Draper whether Mr. Harris's medications were for a mental illness, but defense counsel was unable to obtain a response.

2. Defense counsel then tried to call an expert witness regarding Mr. Harris's medications, but the trial court sustained an objection based on inadequate notice.

3. Despite the inability to obtain a response or call an expert witness on medications, defense counsel continued to list Mr. Harris's "mental condition" as a mitigating factor.

Mr. Harris argues that these three facts show that defense counsel had tried to prove a mental illness through an expert witness but couldn't because counsel had violated evidentiary and disclosure requirements.

A state appellate court's finding may be reasonable even if we would have decided the issue differently. *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013). The test is whether the state appellate court had evidentiary support for its view. *Id.*

Under this test, the OCCA finding was reasonable. When defense counsel called an expert witness to testify about Mr. Harris's medications, the judge asked the relevance. The attorney explained: "It goes to mitigation, that he has something wrong with him and we don't know what it is." 2005 Tr., v. 5, at 152. The attorney added that "[a]ll he is going to do is say these are his medications and one, two, three, and four are mental health medicines the other ones are for something else. And that's all he is going to say." *Id.* at 149.

The OCCA could reasonably find that defense counsel was trying to present limited evidence on mental health, informing the jury of a mental illness without enough detail to spark concern about continued dangerousness. The attorney couldn't ultimately execute this strategy, but the OCCA could view the strategy itself as reasonable. We thus conclude that the OCCA acted reasonably in viewing defense counsel's effort as strategic.

**(ii) Unreasonable Application of Supreme Court Precedents**

The OCCA also reasonably applied Supreme Court precedents on the deficiency prong. The ultimate failure of the attorney's effort does not

undermine the reasonableness of the OCCA's conclusion. *United States v. Haddock*, 12 F.3d 950, 956 (10th Cir. 1993).

Mr. Harris contends that his attorney failed to present expert testimony on the nature, extent, and significance of the mental illness. Again, however, the OCCA acted reasonably in rejecting this contention. As we discuss below, the excluded evidence constituted a "double-edged sword" with substantial aggravating potential. *See* p. 62, below. Given this potential for aggravation, the OCCA justifiably concluded that defense counsel had acted reasonably.

**b.     Prejudice**

Even if Mr. Harris could satisfy the deficiency prong, the claim would have foundered on the prejudice prong. Mr. Harris argues that his counsel's failure to present mitigation evidence of mental illness (1) opened the door to evidence of malingering and (2) bypassed powerful mitigation evidence that would have explained Mr. Harris's violent actions and why, with proper treatment, he would be unlikely to repeat this crime.

In analyzing the prejudice prong, we consider not only the mitigation evidence that defense counsel should have presented but also what the prosecution would have presented in response. *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013). To identify that evidence, we can consider the 2001 trial as a useful guide. At that trial, the prosecution had used Dr. John Call, who testified that

- a "strong possibility" existed that Mr. Harris was a psychopath and

- psychopaths were more violent than other individuals.

2001 Tr., v. 16, at 75–78.

This testimony was supported by Mr. Harris's own expert at the 2001 trial, Dr. Smith. Dr. Smith regarded Mr. Harris as bipolar and acknowledged that bipolar individuals share traits with psychopaths. After acknowledging the sharing of these traits, Dr. Smith refused to rule out Dr. Call's diagnosis of Mr. Harris as a psychopath or as someone with anti-social personality disorder, admitting the presence of "elements" of these conditions in Mr. Harris's history and in his current psychological status. 2001 Tr., v. 18, at 182. Dr. Smith thus admitted that Mr. Harris presented a substantial risk of violence. *Id.* at 183. On cross-examination, Dr. Smith added that Mr. Harris had antisocial traits:

> Q:    But you don't disagree with the diagnosis that [Mr. Harris] has an antisocial personality disorder?
>
> A:    As long as you mix it with a mixed personality disorder with narcissistic, obsessive-compulsive, and antisocial traits. I do believe he does have that.

*Id.* at 192. Dr. Smith also acknowledged that Mr. Harris had each clinical trait associated with antisocial personality disorder.

Given this prior testimony, the OCCA could reasonably conclude that further mitigation testimony involving mental illness would have opened the door to evidence of psychopathy with antisocial personality disorder.

60

"[C]ourts have characterized antisocial personality disorder as the prosecution's 'strongest possible evidence in rebuttal.'" *Littlejohn v. Royal*, 875 F.3d 548, 564 (10th Cir. 2017) (quoting *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013)), *cert. denied*, 139 S. Ct. 102 (2018).

We addressed a similar issue in *Littlejohn v. Royal*, 875 F.3d 548 (10th Cir. 2017), *cert. denied*, 139 S. Ct. 102 (2018). There the petitioner presented evidence of organic brain disorder. The State responded with evidence of a diagnosis involving antisocial personality disorder, and the defense expert admitted that the petitioner had displayed traits consistent with the diagnosis. *Id.* at 565. Given the nature of antisocial personality disorder, we concluded that the evidence of an organic brain disorder was likely to be aggravating rather than mitigating. *Id.*

The same is true here. Like organic brain damage, mental illness can be mitigating; but the OCCA could reasonably view this possibility as outweighed by the risk of rebuttal evidence of psychopathy and antisocial personality disorder.

Mr. Harris argues that the jury at the 2005 retrial heard testimony about his violent past with no explanation involving his mental illness. But the OCCA could reasonably find that the aggravating nature of the omitted evidence had outweighed the mitigation value.

By focusing on Mr. Harris's development rather than his mental illness, defense counsel also kept other possibly aggravating evidence from the jury. For instance, the presence of an untreatable condition could have suggested future dangerousness. *Littlejohn*, 875 F.3d at 565. And Dr. Smith admitted that

- he could not be confident that Mr. Harris would refrain from violence while on medication,

- Mr. Harris had probably been properly medicated during his 2001 competency trial (when he attacked a detention officer), and

- Mr. Harris had probably not been in a psychotic state when he committed the murder.

With these admissions, Dr. Smith could not say whether Mr. Harris's mental illness was connected to the crime.

Finally, Mr. Harris argues that his counsel's actions opened the door to evidence of malingering. Even if defense counsel had presented additional mental-health evidence, however, the State could still have presented evidence of malingering. Indeed, at the 2001 trial, a prosecution witness had testified that Mr. Harris was exaggerating the symptoms of any mental illness. So the OCCA could reasonably consider evidence of malingering as available irrespective of defense counsel's strategy.

In sum, the OCCA acted reasonably in concluding that the omissions were not prejudicial.[30]

## II. Jury Instructions and Closing Arguments on Mitigation Evidence

In capital cases, the Eighth and Fourteenth Amendments ordinarily prevent the trial court from barring consideration of any of the defense evidence on mitigation. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).[31] Mr. Harris argues that the State violated this right in two ways:

1. The trial court instructed the jury too narrowly on the evidence that could be considered mitigating.

---

[30] Mr. Harris points out that

- the jury at the 2001 trial had declined to find the aggravator of future dangerousness after hearing evidence of mental illness and

- the jury at the 2005 retrial did find this aggravator without hearing that evidence.

But other possible explanations may account for the juries' different findings on future dangerousness. For example, the 2001 jury was erroneously instructed on the availability of housing in a minimum-security prison, and the jury at the 2005 retrial heard new evidence about Mr. Harris's violent actions. Given these differences, we decline to speculate about why either jury found as it did.

[31] The *Lockett* plurality stated:

[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

2. In closing argument, the first prosecutor exploited this instruction by telling the jury that it should consider mitigation evidence only if it diminished Mr. Harris's moral culpability.

These errors, according to Mr. Harris, created a reasonable likelihood that one or more jurors believed themselves unable to consider some of Mr. Harris's mitigation evidence.

## A. The Standard of Review

The OCCA rejected this claim. Because Mr. Harris did not object to the instruction or the closing argument, the OCCA reviewed for plain error. *Harris v. State*, 164 P.3d 1103, 1113 (Okla. Crim. App. 2007). Applying the plain-error standard, the OCCA relied on its precedent to find the jury instruction constitutional. *E.g.*, *Williams v. State*, 22 P.3d 702, 727 (Okla. Crim. App. 2001), *cited with approval in Harris*, 164 P.3d at 1113 n.40. The OCCA thus focused on the prosecutors' arguments, considering how they might have affected the jury's ability to consider mitigation evidence. In considering this effect, the OCCA found that

- the first prosecutor's argument had been improper and

- the second prosecutor's argument and the jury instruction had rendered the first prosecutor's argument harmless.

---

*Lockett*, 438 U.S. at 604 (emphasis in original) (footnote omitted). A majority of the Supreme Court later adopted this view in *Eddings v. Oklahoma*, 455 U.S. 104, 113–15 (1982).

*Harris*, 164 P.3d at 1113–14.

We treat the OCCA's decision under the plain-error standard as an adjudication on the merits. *Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015); *see* pp. 3–4, above. We thus review this decision under 28 U.S.C. § 2254(d). *Hancock*, 798 F.3d at 1011–12; *see* pp. 3–4, above.[32]

This review comprises two parts. We first ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Underwood v. Royal*, 894 F.3d 1154, 1169 (10th Cir. 2018) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)), *cert. denied*, 139 S. Ct. 1342 (2019). We then ask whether a reasonable likelihood exists that "arguments by the prosecutor . . . reinforced an impermissible interpretation of [the challenged jury instruction] and made it likely that jurors would arrive at such an understanding." *Id.* (quoting *Boyde*, 494 U.S. at 384).

---

[32] As noted above, the OCCA stated that the first prosecutor's argument was improper but harmless. *Harris v. State*, 164 P.3d 1103, 1113–14 (Okla. Crim. App. 2007). But the test (discussed in the text) determines whether a constitutional violation took place, not whether an error was harmless. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (stating that *Boyde*'s test of "reasonable likelihood" is used to determine whether a constitutional error took place, not to determine harmlessness).

## B.    The Jury Instruction

Mr. Harris challenges Instruction Number 8, which stated in part: "Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." R. at 1607. Mr. Harris argues that this instruction improperly prevented the jury from considering all available mitigation evidence.

We rejected this argument in *Hanson v. Sherrod*, where we considered the constitutionality of the same instruction. 797 F.3d 810 (10th Cir. 2015). When faced with this argument, we addressed the instructions as a whole. *Id.* at 851 (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)). Viewing them as a whole, we noted that three other jury instructions had suggested that the jury would recognize its ability to consider all of the defendant's mitigation evidence:

1.    The trial court had instructed the jury that it was to decide which "circumstances [were] mitigating . . . under the facts and circumstances of this case."

2.    Another jury instruction had identified many mitigating circumstances, and some did not involve moral culpability.

3.    The trial court had also instructed the jury that it "may decide that other mitigating circumstances exist, and if so, [the jury] should consider those circumstances as well."

*Id.* Given these instructions, we concluded in *Hanson* that a jury would not "have felt precluded from considering any mitigation evidence, including the testimony of the four testifying witnesses." *Id.*

66

The same three instructions were given here. So under *Hanson*, we conclude that the OCCA reasonably determined that the jury would have understood its ability to consider all of Mr. Harris's mitigation evidence. *Hanson*, 797 F.3d at 851; *see Simpson v. Carpenter*, 912 F.3d 542, 578 (10th Cir. 2018).

Mr. Harris argues that the OCCA has

- expressed concern about the way that Oklahoma prosecutors have used the jury instruction and

- ordered revision of the jury instruction to minimize future abuses.

*Harris v. State*, 164 P.3d 1103, 1114 (Okla. Crim. App. 2007). But we have twice rejected the same argument, reasoning that the OCCA's concern over the wording of the instruction did not suggest that it was unconstitutional. *Hanson v. Sherrod*, 797 F.3d 810, 851 (10th Cir. 2015); *Grant v. Royal*, 886 F.3d 874, 934–35 (10th Cir. 2018). Given these prior decisions, we conclude that the OCCA's concern over the instruction did not render its constitutional holding unreasonable.

## C.   The Prosecutors' Closing Arguments

Mr. Harris argues that even if the jury instruction itself had been constitutional, one of the prosecutors improperly exploited the jury instruction to urge disregard of Mr. Harris's mitigation evidence, violating the Eighth and Fourteenth Amendments. The OCCA rejected this argument. The court acknowledged that the first prosecutor's arguments had been

67

improper; however, the court considered the impropriety harmless because the jury instructions on mitigating circumstances were proper and the second prosecutor had invited the jury to consider all of the mitigating circumstances. *Harris v. State*, 164 P.3d 1103, 1113 (Okla. Crim. App. 2007).[33] In the OCCA's view, the "second prosecutor invited jurors to consider all Harris's mitigation evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate." *Id.* Mr. Harris contends that the OCCA acted unreasonably in finding facts and applying Supreme Court precedents. We disagree because

- the OCCA could reasonably view this part of the closing argument as an invitation to consider all of the evidence on

---

[33]  At oral argument, the State defends the first prosecutor's arguments, stating that they invited the jury to consider mitigation evidence and to give it little weight. For example, the first prosecutor acknowledged that the jury

- could consider "sympathy or sentiment for the defendant" and

- needed to determine the importance of the mitigating circumstances.

2005 Tr., v. 6, at 909. And this prosecutor acknowledged the jury's need to balance the mitigating and aggravating circumstances. *Id.* at 940–41. But the OCCA found that the first prosecutor's arguments had been improper:

One prosecutor did consistently argue in closing that jurors should not consider Harris's second stage evidence as mitigating, since it did not extenuate or reduce his guilt or moral culpability. This argument improperly told jurors not to consider Harris's mitigating evidence.

*Harris v. State*, 164 P.3d 1103, 1113 (Okla. Crim. App. 2007).
.

mitigation and find it overridden by the horrific nature of the crime and

- Mr. Harris has not shown that the OCCA based its decision on an erroneous interpretation of the prosecutor's closing argument.

## 1.    Applicability of 28 U.S.C. § 2254(d)

The threshold issue is whether § 2254(d) applies. It ordinarily would apply if the OCCA adjudicated the merits of Mr. Harris's constitutional claim. *See* pp. 3–4, 10, above. The OCCA wasn't explicit. It characterized the first prosecutor's closing argument as improper, but didn't say whether this impropriety rose to the level of a constitutional violation. Regardless of the basis for characterizing the argument as improper, the OCCA ultimately regarded the impropriety as harmless. *Harris*, 164 P.3d at 1113–14.

The district court characterized the OCCA's reasoning as an adjudication on the merits, triggering § 2254(d). D. Ct. Dkt. 77 at 49. In his appeal briefs, Mr. Harris doesn't question this characterization. We thus decline to sua sponte revisit the district court's application of § 2254(d). *See Grant v. Royal*, 886 F.3d 874, 931–32 n.20 (10th Cir. 2018) (concluding that the Court should not sua sponte reject the applicability of the AEDPA on a claim involving the prosecutor's improper exploitation of a jury instruction defining the proper use of mitigating evidence).

## 2. Unreasonable Determination of Fact

In his rebuttal argument, the second prosecutor told the jury:

I'm asking you to make a decision that I believe is based upon principal [sic], to examine the evidence, determine whether you believe beyond a reasonable doubt one or both of these aggravators are in existence, and I submit to you, and then to make a determination of whether these—these mitigation issues that [Mr. Harris's attorney] has brought up really override the day of terror, and a day that took a couple of weeks to think through.

2005 Tr., v. 6, at 982–83. In our view, the OCCA could reasonably construe this statement as an invitation to weigh all of the mitigation evidence against the aggravation evidence and decide that the death sentence was appropriate.

The prosecutor did contend that the defense's arguments on mitigation would not "override the day of terror." The term "override" refers to the act of weighing one item against another. *See Override*, *Oxford English Reference Dictionary* 1038 (Judy Pearsall & Bill Trumble eds., 2d ed. rev. 2006) (providing a primary definition of "override" as "have a claim precedence or superiority over"). Given this meaning of "override," the OCCA could reasonably conclude that the second prosecutor had urged the jury to consider all of the mitigation evidence and to find that it paled in comparison to the terrible nature of the crime itself. Under this interpretation, the second prosecutor's rebuttal argument would not have restricted the universe of circumstances that could be considered

70

mitigating. *Grant v. Royal*, 886 F.3d 874, 938 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 925 (2019).

Mr. Harris notes that the second prosecutor also referred to moral culpability: "Do not reward this man for the things that he claims are somehow supposed to not make this as blameful, if you will, these things that he says somehow lessen his blame, lessen his moral responsibility." 2005 Tr., v. 6, at 983. According to Mr. Harris, this statement reflects further efforts to restrict mitigating circumstances to those bearing on moral culpability. This argument bears defects that are both procedural and substantive.

The argument is procedurally defective because

- in the state-court appeal, defense counsel never criticized the second prosecutor's reference to moral culpability and

- in our appeal, defense counsel did not criticize this statement in their opening brief.

Defense counsel instead referred to this excerpt only in their reply brief, when the State no longer had an opportunity to respond. Making the argument in the reply brief was too late. *See Byrd v. Workman*, 645 F.3d 1159, 1166 n.8 (10th Cir. 2011).

Even if we were to consider the second prosecutor's reference to moral culpability, however, it would not render the OCCA's interpretation unreasonable. The second prosecutor was responding to what defense counsel had argued. Defense counsel had argued that Mr. Harris was not a

cold-blooded terrorist and was reacting to setbacks involving divorce and unemployment. The second prosecutor characterized this argument as an effort to minimize blame and moral culpability. With this characterization, the prosecutor attributed the statement about blame and moral culpability to defense counsel, arguing that "the [defense counsel] says [these things] somehow lessen [Mr. Harris's] blame, lessen his moral responsibility." 2005 Tr., v. 6, at 983. The prosecutor himself was not suggesting that the universe of mitigating circumstances should be limited to those that diminish blame or moral culpability; he was saying that defense counsel's argument involved an effort to downplay blame and moral culpability. We thus do not regard the OCCA's interpretation of the rebuttal argument as objectively unreasonable.

Even if the OCCA had unreasonably interpreted the rebuttal argument, however, § 2254(d)(2) would prevent the district court from reaching the merits. Under § 2254(d)(2), the habeas court can consider the merits only if the petitioner shows that the OCCA based its decision on the factual error. 28 U.S.C. § 2254(d)(2); *see Lott v. Trammell*, 705 F.3d 1167, 1177 (10th Cir. 2003) (stating that "the burden rests on [the petitioner] to establish that the OCCA's analysis was 'based on an unreasonable determination of the facts'" (quoting 28 U.S.C. § 2254(d)(2))).

In deciding that the first prosecutor's improper arguments were harmless, the OCCA gave two reasons:

72

1. The second prosecutor told the jury to consider all of Mr. Harris's mitigating circumstances and find that the death penalty was appropriate based on the greater strength of the aggravating circumstances.

2. The trial court properly instructed the jury on the definition of mitigation evidence, Mr. Harris's evidence, and the jurors' duties.

*Harris v. State*, 164 P.3d 1103, 1113 (Okla. Crim. App. 2007).

Mr. Harris challenges the first reason, but not the second. Let's assume, for the sake of argument, that the first reason was objectively unreasonable. Given this assumption, the OCCA's second reason would remain valid and provide sufficient support for the OCCA's finding of harmlessness:

> [E]ven if a state court's individualized factual determinations are overturned, what factual findings remain to support the state court decision must still be weighed under the overarching standard of section 2254(d)(2).

*Lambert v. Blackwell*, 387 F.3d 210, 235–36 (3d Cir. 2004). Indeed, the OCCA has elsewhere found improper closing arguments harmless when the jury was properly instructed. *E.g.*, *Miller v. State*, 313 P.3d 934, 977 (Okla. Crim. App. 2013); *Ake v. State*, 663 P.2d 1, 9 (Okla. Crim. App. 1983), *rev'd on other grounds*, 470 U.S. 68 (1985). So even if the OCCA had unreasonably interpreted the second prosecutor's closing argument, Mr. Harris would have failed to show that the decision itself had been based on this factual error.

\* \* \*

In sum, Mr. Harris has not satisfied his burden of showing that the OCCA based its decision on an unreasonable factual determination. The OCCA could reasonably interpret the second prosecutor's argument as an invitation to consider all of the mitigation evidence and find it overridden by the aggravating circumstances. The second prosecutor did mention moral culpability, but Mr. Harris did not address this statement in the state-court appeal or in his opening appellate brief. And the second prosecutor referred to moral culpability only when he paraphrased defense counsel's argument. In these circumstances, Mr. Harris has not overcome § 2254(d)(2).

### 3.     Unreasonable Application of Supreme Court Precedent

Mr. Harris also argues that the OCCA's decision entailed an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). We reject this argument.

Like Mr. Harris and the OCCA, we view the first prosecutor's comments as improper. The first prosecutor told the jury that a mitigating circumstance was something that "extenuates or reduces the degree of moral culpability or blame of [Mr.] Harris for murdering Merle Taylor." 2005 Tr., v. 6, at 929. The prosecutor then pointed to each alleged mitigating circumstance and asked if it reduced or extenuated Mr. Harris's

74

moral culpability. *Id.* at 929–40. The prosecutor then proposed a two-part test:

> One, is it true? Is what they have listed here true? Did it really happen? And, two, if it is true, does it make a difference? Does it extenuate or reduce his culpability for the murder of Merle Taylor? *Because it's got to be both.*

*Id.* at 930 (emphasis added). Through these statements, the prosecutor effectively told the jury that the mitigation evidence mattered only if it tended to reduce Mr. Harris's culpability, creating a risk that one or more jurors believed that they could not consider constitutionally relevant evidence of mitigation. *See Underwood v. Royal*, 894 F.3d 1154, 1169 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1342 (2019).

We thus inquire whether "the OCCA could reasonably conclude that it was not reasonably likely that the [first] prosecutor's comment[s] precluded the jury from considering mitigation evidence, in light of the jury instructions and the other unchallenged comments of the prosecution." *Grant v. Royal*, 886 F.3d 874, 939 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 925 (2019). Under this inquiry, a court could grant habeas relief only if "no fairminded jurist would agree with the OCCA's conclusion that the jury was not precluded from considering the evidence offered by [the petitioner] in mitigation." *Simpson v. Carpenter*, 912 F.3d 542, 582 (10th Cir. 2018). In our view, fair-minded jurists could have agreed with the

75

OCCA's conclusion in light of the jury instructions and the second prosecutor's rebuttal argument.

When the petitioner argues that a prosecutor exploited a jury instruction to improperly restrict what could be mitigating, we consider the extent to which the jury was properly instructed. *See, e.g.*, *Grant*, 886 F.3d at 939; *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015). The jury at the 2005 retrial received virtually all of the jury instructions that we have regarded as curative. For example, the trial court instructed the jury that

- "the determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case" and

- evidence had been introduced on a long list of mitigating circumstances (many of which bore no relationship to moral culpability).

*See* pp. 66–67, above. In detailing the mitigating circumstances, the trial court reminded the jury of evidence that Mr. Harris

- had a "sister and a brother who love him" and "daughters who love[d] and need[ed] him,"

- had a "low I.Q.,"

- had been addicted to drugs and alcohol, and

- had lost his mother to cancer when he was young.

R. at 1608–10. These instructions served to broaden the first prosecutor's language, suggesting to the jury that it could consider all of the mitigation evidence regardless of whether it related to moral culpability. *Hanson*, 797

F.3d at 851; *see Brown v. Payton*, 544 U.S. 133, 144 (2005) ("[F]or the jury to have believed it could not consider Payton's mitigating evidence, it would have had to believe that the penalty phase served virtually no purpose at all.").

In similar circumstances, we have often held that prosecutors' improper arguments on mitigation evidence are ameliorated by the jury instructions. *E.g.*, *Grant v. Royal*, 886 F.3d 874, 939–42 (10th Cir. 2018); *Underwood v. Royal*, 894 F.3d 1154, 1171–73 (10th Cir. 2018); *Simpson v. Carpenter*, 912 F.3d 542, 581–82 (10th Cir. 2018); *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 911–12 (10th Cir. 2019); *Johnson v. Carpenter*, 918 F.3d 895, 907–08 (10th Cir. 2019); *Harmon v. Carpenter*, 936 F.3d 1044, 1074–77 (10th Cir. 2019). For example, in *Cuesta-Rodriguez v. Carpenter*, the trial court instructed the jury on numerous mitigating circumstances, told the jury that it was to determine what was mitigating, and stated to the jury that it could consider sympathy for the defendant. *Cuesta-Rodriguez*, 916 F.3d at 911–12. Given these instructions, we held that the OCCA had reasonably applied Supreme Court decisions in rejecting a similar constitutional claim. *Id.* at 912. All of these instructions were given here.

Mr. Harris contends that in one of our prior cases, *Grant v. Royal*, the trial court had given two instructions that were omitted here:

77

1. that the jury instructions contained all of the law and rules for the jury to follow and

2. that the prosecutor's closing arguments were arguments only and for purposes of persuasion.

We reject these contentions.

Mr. Harris contends that the *Grant* panel found it "critically ameliorative" that the trial court had told the jury that the instructions contained all of the law and rules to be followed. Appellant's Reply Br. at 32. Though the *Grant* panel did consider this instruction, along with others, the panel did not suggest that this instruction was "critical" to the outcome. Instead, the *Grant* panel simply mentioned this instruction "[i]n addition" to others. *Grant*, 886 F.3d at 941. Indeed, many of our opinions recognize the ameliorative impact of other jury instructions with no indication that the jury had been told that the instructions constituted all of the law and rules to be followed. *E.g.*, *Simpson*, 912 F.3d at 581–82; *Cuesta-Rodriguez*, 916 F.3d at 911–12; *Johnson*, 918 F.3d at 907–08.

But even if this instruction had been critical, it *was* given to Mr. Harris's jury. Just after voir dire, the trial court instructed Mr. Harris's jury that its responsibility was "to follow the law as stated in the instruction that [the trial court] will give [the jury]." 2005 Tr., v. 2, at 427. The trial court returned to the subject later, explaining what would likely happen if the jury were to ask questions during its deliberations. 2005 Tr., v. 6, at 984. The court explained that it would likely answer that the jury

78

has "all the law and evidence necessary to reach a verdict." *Id.* The court explained that this answer would mean that all of the necessary information is in the jury instructions or the evidence. *Id.* at 984–85. Thus, Mr. Harris's jury *was* ultimately told that all of the applicable law was in the instructions.

Mr. Harris also observes that the jury in *Grant* had been told that the prosecutor's remarks constituted only argument and were offered only for persuasion. 886 F.3d at 941–42. Mr. Harris says that this instruction was "critical" in *Grant*. Appellant's Reply Br. at 32. We are not sure why Mr. Harris regards this instruction as critical, for the *Grant* panel attached no particular importance to this instruction. In any event, Mr. Harris's jury *was* instructed to confine itself to the evidence and reminded that "[n]o statement or argument of the attorneys [was] itself evidence." 2005 Tr., v. 2, at 428.

Along with the ameliorating jury instructions, some of the second prosecutor's arguments also mitigated the risk from the first prosecutor's improper arguments. For example, the second prosecutor told the jury to weigh the defense's evidence against the aggravating evidence to see if the mitigation evidence outweighed the aggravating evidence.[34] And both

---

[34] Mr. Harris insists that the second prosecutor did not suggest to the jury that it consider any of the mitigation evidence. According to Mr. Harris, the absence of such a suggestion distinguishes *Simpson v. Carpenter* and *Grant v. Royal*. We disagree. As noted above, the OCCA

prosecutors spent considerable time rebutting the defense's mitigation evidence even when it had not involved moral culpability. The prosecutors attacked this evidence not only because it bore no relationship to moral culpability but also on grounds that the evidence lacked reliability or trustworthiness. For example, the first prosecutor attacked the reliability of Mr. Harris's evidence on an intellectual impairment. From this attack, the jury could "logically infer from this presentation that the evidence actually *did* legally qualify as mitigating evidence, and that the question before them" involved the accuracy, credibility, and weight of this evidence. *Grant v. Royal*, 886 F.3d 874, 943 (10th Cir. 2018) (emphasis in original).

Mr. Harris underscores the repeated nature of the first prosecutor's improper comments. But we've upheld the reasonableness of a similar conclusion by the OCCA even when the prosecutor had made at least "nine separate statements which either generally defined mitigating evidence as

---

reasonably concluded that the second prosecutor had invited the jury to consider all of the evidence, both mitigating and aggravating. *See* pp. 71–74, above. But this factor was *not* present in *Simpson*. There we described the prosecutor's improper arguments as "pervasive," "extensive," and "recurring." 912 F.3d 542, 581, 588 (10th Cir. 2018), *petition for cert. filed* (U.S. July 24, 2019) (No. 19-5298). Nowhere did we rely on arguments inviting the jury to weigh the mitigation evidence. *See id.* at 585–87. The same is true in *Grant*. 886 F.3d 874, 943 (10th Cir. 2018) ("To be sure, unlike *Hanson*, there were no further statements from the prosecution — i.e., Ms. Elliott — in rebuttal closing that could reasonably suggest that 'the prosecutor encouraged the jury to consider all sorts of mitigating evidence.'" (quoting *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015))).

reducing moral culpability or blame or specifically compared [the petitioner's] mitigating factors to that definition." *Simpson v. Carpenter*, 912 F.3d 542, 578 (10th Cir. 2018). And there the prosecutor had not said anything to encourage consideration of all mitigating factors. *Id.* at 580; *see* note 34, above.

Given the ameliorating jury instructions and the closing arguments as a whole, fair-minded jurists could agree with the OCCA's conclusion that the jury had understood its ability to consider Mr. Harris's mitigation evidence. We thus conclude that the OCCA did not unreasonably apply Supreme Court precedent.

## III. Victim-Impact Testimony

Mr. Harris also contends that the prosecution improperly elicited victim-impact testimony. Though some of the testimony was unconstitutional, the constitutional violation was harmless.

### A. The Constitutional Limit on Victim-Impact Testimony

Mr. Harris's contention stems from the interplay between two Supreme Court opinions: *Booth v. Maryland* and *Payne v. Tennessee*. In *Booth v. Maryland*, the Supreme Court held that the introduction of victim-impact testimony at a capital-sentencing proceeding violated the Constitution. 482 U.S. 496, 509 (1987). In *Payne v. Tennessee*, the Supreme Court overruled part of *Booth*, holding that "evidence and argument relating to the victim and the impact of the victim's death on the

81

victim's family are []admissible at a capital sentencing hearing." 501 U.S. 808, 830 n.2 (1991). But the *Payne* Court did not overrule *Booth*'s recognition that the Constitution forbids "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Id.* Thus, *Booth* continues to ban the families of murder victims from requesting a particular sentence. *Bosse v. Oklahoma*, 580 U.S. ___, 137 S. Ct. 1, 2 (2016) (per curiam).

**B.  The Victim-Impact Testimony and the Issue of Harmlessness**

In Mr. Harris's case, two of Mr. Taylor's family members requested the death penalty. Mr. Harris argues that allowing this testimony violated the Constitution. The OCCA rejected this argument. *Harris v. State*, 164 P.3d 1103, 1110 (Okla. Crim. App. 2007). The OCCA was wrong: Introduction of this testimony was unconstitutional under *Booth* and *Payne*, and the OCCA's decision was contrary to clearly established Supreme Court precedent. *Dodd v. Trammell*, 753 F.3d 971, 996 (10th Cir. 2013).

The remaining question is whether the constitutional error was prejudicial or harmless. On this question, we engage in de novo review. *Lockett v. Trammell*, 711 F.3d 1218, 1238 (10th Cir. 2013). We regard the improper testimony as prejudicial only if it had a substantial and injurious effect or influence in determining the jury's verdict. *Id.*

Mr. Taylor's son testified for the State, asking for the death penalty: "On behalf of myself, my entire family, I respectfully ask that you impose

the maximum allowable punishment and, in my mind, the only acceptable punishment, and sentence [Mr.] Harris to death." 2005 Tr., v. 4, at 891. Mr. Taylor's widow also testified, asking the jury to impose the death penalty: "It grieves me that my husband went to his grave not knowing why he had to die. My sons, grandchildren, and I ask you to sentence [Mr.] Harris to death." *Id.* at 901.

In her closing argument, the first prosecutor did not refer to the family members' requests for the death penalty. She instead urged the jury: "Do not be guilted into making your decision because . . . the Taylors are going to be upset, frankly. Make your decision because it is right, it is just, it is what is appropriate." 2005 Tr., v. 6, at 935. Similarly, the second prosecutor did not explicitly mention the family members' requests for the death penalty. But this prosecutor did quote extensively from the family members' testimony, urging the jury not to reward Mr. Harris by sparing his life. Right after asking the jury one more time not to "reward [Harris]," the second prosecutor continued, "Toby Taylor [the son] and Carolyn Taylor [the widow] said this." *Id.* at 979. The prosecutor then summarized the family members' testimony on how they were affected by the murder.

C.    **Structural or Harmless Error**

The threshold issue is whether a habeas court can review for harmlessness when the trial court improperly allows victim-impact

83

testimony. Mr. Harris opposes review for harmlessness and urges us to treat the requests for the death penalty as structural error, contending that

- Oklahoma prosecutors regularly elicit family requests for the death penalty and

- the OCCA has improperly tolerated this pattern of improper conduct.[35]

But we have rejected the same arguments in *Underwood v. Royal*, holding that erroneous introduction of victim-impact testimony is reviewable for harmlessness. 894 F.3d 1154, 1177 (10th Cir. 2018). We are bound by this precedent. *Leatherwood v. Albaugh*, 861 F.3d 1034, 1042 n.6 (10th Cir. 2017). Given this precedent, we consider whether the error was harmless.[36]

---

[35] Until 2017, the Oklahoma Court of Appeals had interpreted *Payne* to overrule *Booth* in its entirety. *Bosse v. State*, 360 P.3d 1203, 1226 (Okla. Crim. App. 2015). The Supreme Court expressly rejected the OCCA's view in *Bosse v. State*, reiterating that *Payne* had left intact *Booth*'s prohibition against a family member's request for a particular sentence. *Bosse v. Oklahoma*, 580 U.S. ___, 137 S. Ct. 1, 2 (2016) (per curiam). On remand, the OCCA overruled its prior cases and held that the Constitution forbids victim-impact testimony recommending a particular sentence. *Bosse v. State*, 400 P.3d 834, 855 (Okla. Crim. App. 2017).

[36] The Supreme Court has noted that an unusual case might involve a pattern of prosecutorial misconduct so egregious that habeas relief might be appropriate even without prejudice. *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993). But when the 2005 retrial took place in an Oklahoma courtroom, Oklahoma's highest criminal court had held that the Constitution did not forbid victim testimony requesting a particular sentence. *E.g.*, *Murphy v. State*, 47 P.3d 876, 885 (Okla. Crim. App. 2002), *overruled in part on other grounds by Blonner v. State*, 127 P.3d 1135, 1139 (Okla. Crim. App. 2006). We had said the opposite. *Hooper v. Mullin*, 314 F.3d 1162, 1174 (10th Cir. 2002). But Oklahoma prosecutors were simply following what Oklahoma's highest criminal court had said on the issue.

## D. Harmlessness

We regard the erroneous introduction of victim-impact testimony as harmless.

For harmlessness, we consider whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). On one occasion, we concluded that improper victim-impact testimony had a substantial and injurious effect or influence. *Dodd v. Trammell*, 753 F.3d 971, 997 (10th Cir. 2013). There we relied on three factors:

1. The prosecution had elicited a "drumbeat" consisting of six to seven witnesses requesting the death penalty.

2. The jury had rejected the State's arguments for aggravating circumstances involving a "heinous, atrocious, or cruel" murder or the existence of a "continuing threat."

3. The case for the defendant's guilt had not been clear-cut.

---

Even if we were to regard the prosecutor's conduct as egregious, however, a habeas court could avoid the issue of harmlessness only if the victim-impact testimony had rendered the trial fundamentally unfair. *Underwood v. Royal*, 894 F.3d 1154, 1178 (10th Cir. 2018). As discussed elsewhere, the improper testimony consisted of two sentences in a five-day trial. Though the two sentences were emotional and powerful, they did not render the entire trial fundamentally unfair.

*Id.* at 997–98. None of these factors are present here. Only two testifying witnesses requested death, far from a "drumbeat."[37] The jury also found the aggravator of a continuing threat, and Mr. Harris has not challenged his guilt.

Other factors also point to harmlessness, including the ameliorating influence of the jury instructions, the brevity of the improper testimony, and the absence of any mention in the prosecutors' closing arguments. For example, the trial court instructed the jury that it could consider the evidence "in determining an appropriate punishment," but only as "a moral inquiry into the culpability of the defendant" and not based on an "emotional response to the evidence." R. at 1616. The jury was also told that it *could* consider "sympathy or sentiment for the defendant." *Id.* at 1618 (emphasis in original). These instructions mitigated the prejudicial impact of the improper victim-impact testimony. *DeRosa v. Workman*, 679 F.3d 1196, 1240 (10th Cir. 2012). We consider not only the ameliorating instructions but also the brevity of the improper testimony, which

---

[37] Even when the prosecution presents a "drumbeat" of improper victim testimony, the constitutional violation may be harmless. In *Bush v. Carpenter*, for example, "sentence recommendations were lengthy [and] egregious." 926 F.3d 644, 668 (10th Cir. 2019); *see also id.* at 680 ("[T]he victim impact statements were numerous, emotional, and in at least one instance, egregious . . . ."). Still, we held that the constitutional violation was harmless "given the circumstances of the murder, the presence of the aggravating factors, and the substantial evidence presented in support of those aggravating factors." *Id.* at 681.

consisted of only two sentences. *See Lockett v. Trammell*, 711 F.3d 1218, 1239 (10th Cir. 2013) (considering the error to be harmless when the family's requests for death consisted of "a single, concise sentence").[38] And in their closing arguments, the prosecutors did not explicitly refer to the family members' requests for the death penalty.

Mr. Harris argues that the State presented a weak case on aggravation.[39] We disagree. The jury found two aggravators:

1.     great risk of death to more than one person and

2.     continuing threat.

Mr. Harris does not challenge the sufficiency of the evidence on either aggravator, and the State presented powerful evidence on both.

First, to show a great risk of death to more than one person, the State presented evidence that Mr. Harris had not only killed Mr. Taylor but also

---

[38]     Mr. Harris argues that the son's request was expansive, consisting of seventeen pages of argument on why the death penalty was the only appropriate punishment. But the son's testimony mainly concerned the effect of the crime, which was permissible. *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991) ("A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.").

[39]     For this argument, Mr. Harris relies on *Dodd v. Trammell*, 753 F.3d 971, 998 (10th Cir. 2013), where we discounted the aggravating factors because they had added little beyond the findings of guilt. *Dodd*, 753 F.3d at 998. There the jury's finding of an aggravator involving a prior conviction had been based on a decades-old conviction, and the aggravator for great risk of death to more than one person had been based on the fact that the defendant had murdered two people. *Id.*

fired multiple times at Pam Harris and Jennifer Taylor. Pam Harris testified that she had suffered a gunshot to her hip and had seen the gun aimed at her head. She struggled as Mr. Harris tried to reload the gun, which he then used to smash her on the head and face.

Second, the State presented considerable evidence of the aggravator involving a continuing threat. This evidence included

- bar fights,

- physical abuse of Pam Harris,

- intimidating tactics, and

- threats against Pam Harris's family.

Given this evidence, the OCCA reasonably found "a lifelong pattern of using violence to solve problems and react to situations which is likely to continue." *Harris v. State*, 164 P.3d 1103, 1111 (Okla. Crim. App. 2007).

Mr. Harris, of course, would have been imprisoned for life if he had avoided the death penalty. But even while he was in jail, Mr. Harris had assaulted a guard. In this incident, Mr. Harris covered his cell window and surprised the guard, repeatedly pummeling him.

Mr. Harris attributes this assault to his need for medication. But Dr. Smith acknowledged that Mr. Harris had probably been medicated at the time of the assault.[40]

---

[40] Mr. Harris suggests that county officers might have "messed up" his medications, stating that the Oklahoma Department of Corrections is much

88

\* \* \*

We conclude that the constitutional error did not substantially affect the jury's sentencing recommendation, so the district court acted correctly in rejecting this habeas claim.

## IV. Cumulative Error

Mr. Harris also urges cumulative error. In our view, the district court should revisit this issue on remand.

A cumulative-error analysis aggregates all errors that are individually harmless, analyzing whether the cumulative effect undermines confidence in the fairness of the retrial and reliability of the verdict. *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003). We consider cumulative errors to be separate constitutional violations. *Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015).

When we reject a claim of ineffective assistance based on a lack of prejudice, we can aggregate the prejudice from the deficient performance. *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003). As a result, the claim of cumulative error would ordinarily include the prejudice from two claims:

---

more reliable in administering medication. Appellant's Reply Br. at 23. For this suggestion, however, Mr. Harris relies on evidence from the 2001 trial, not the 2005 retrial involved in this appeal. In the 2005 retrial, no one presented evidence of an error in medicating Mr. Harris before this assault.

1.  any prejudice from counsel's failure to seek a pretrial hearing on an intellectual disability and

2.  an error in admitting the victim-impact testimony.

On the claim of cumulative error, the OCCA also included any incremental prejudice from the first prosecutor's closing argument about the jury's consideration of mitigation evidence. *Harris v. State*, 164 P.3d 1103, 1119 (Okla. Crim. App. 2007). We have held that Mr. Harris failed to show an unreasonable legal or factual determination on the constitutionality of the closing arguments. *See* pp. 67–81, above. Though we have not recognized a constitutional violation involving the closing arguments, the constitutional test bears a close resemblance to the test for harmlessness. *See Boyde v. California*, 494 U.S. 370, 393 (1990) (Marshall, J., dissenting) ("[T]he 'reasonable likelihood' standard should be understood to be an equivalent of the 'harmless error' standard adopted in *Chapman v. California*."). Arguably, then, any incremental prejudice from this claim may need to be combined with the prejudice from defense counsel's failure to seek a pretrial hearing on an intellectual disability and a constitutional error in allowing the victim-impact testimony.

But the parties have not briefed whether this claim should be considered in the mix on the claim of cumulative error. We thus leave consideration of this threshold issue to the district court on remand. *See Greystone Const., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272,

90

1290 (10th Cir. 2011) ("[T]he better practice on issues raised [below] but not ruled on by the district court is to leave the matter to the district court in the first instance." (quoting *Apartment Inv. & Mgmt. Co. v. Nutmeg Ins. Co.*, 593 F.3d 1188, 1198 (10th Cir. 2010))).

The State also contends that in analyzing the claim of cumulative error, the court should not include any prejudice from the failure to request a pretrial hearing on an intellectual disability, asserting that the prejudice would have arisen before the trial and could not "accumulate with trial errors." Appellee's Resp. Br. at 96. But all we have are two sentences without any explanation, authority, or response. So we also leave this second threshold issue for the district court to decide in the first instance. *See Greystone Const., Inc.*, 661 F.3d at 1290.

## Motion to Expand the Certificate of Appealability

Mr. Harris moves to expand the certificate of appealability to include whether "trial counsel breached his duty to Mr. Harris by his failure to present as mitigation a psychological risk assessment to diminish the evidence presented by the State that Mr. Harris posed a continuing threat to society." Appellant's Mot. for Modification of Certificate of Appealability at 2 (text case changed).

At the 2005 retrial, the State urged an aggravating circumstance involving Mr. Harris's continued threat. The defense countered with Dr. Draper, who testified that

- Mr. Harris had been incarcerated for over 1800 days with only one incident,

- Mr. Harris would not be dangerous in the structured environment of a prison,

- the availability of proper medication would remove any possible danger, and

- murderers are generally less likely than others to act violently while in prison.

Mr. Harris argues that defense counsel should have presented expert testimony of a risk assessment. In state court, for example, Mr. Harris presented a risk assessment by J. Randall Price, Ph.D. The OCCA rejected this argument, concluding that defense counsel had acted reasonably at the 2005 retrial. *Harris v. State*, 164 P.3d 1103, 1118–19 (Okla. Crim. App. 2007).

We could grant a certificate of appealability on this issue only if the district court's ruling were debatable among reasonable jurists. *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). Because the OCCA adjudicated the merits of the deficiency prong, the federal district court would need to apply § 2254(d) on this prong. *See* pp. 55–56, above. Mr. Harris could thus obtain a certificate of appealability on this claim only by showing that reasonable jurists could debate his ability to clear the hurdle of § 2254(d). *See Dunn v. Madison*, 583 U.S. ___, 138 S. Ct. 9, 11 (2017) (per curiam).

No reasonable jurist would regard this issue as debatable. As the OCCA noted, defense counsel

92

- had countered the prosecution with Dr. Draper, who testified that Mr. Harris would not pose a significant risk of future violence in a structured environment, and

- had strategic reasons to limit the evidence of future dangerousness.

Mr. Harris contends that Dr. Price could have provided more persuasive evidence. But Dr. Price's opinion created two risks:

1. His opinion could have backfired.

2. Dr. Price had diagnosed Mr. Harris as bipolar with psychotic features, which could have led to further evidence of dangerousness.

Dr. Price opined that even in a maximum-security prison, Mr. Harris had "an 18.8% probability of violent conduct." Appl. for Evid. Hearing, Exh. B-2 at 7. In stating this opinion, Dr. Price defined "violent" conduct as an "assaultive or dangerous" act creating an imminent threat of serious bodily injury. *Id.* at 6. The OCCA could reasonably infer that defense counsel might have regarded an 18.8% risk of future violence as high. Indeed, Dr. Price acknowledged that this percentage exceeded the base rate for capital murderers (16.4%). *Id.* at 7.

Second, Dr. Price noted that Mr. Harris had "been diagnosed as bipolar with psychotic features." *Id.* at 8. An acknowledgment of psychotic features could have led the State to present additional evidence of future dangerousness. In the 2001 trial, for example, Dr. Smith acknowledged that bipolar disorder and psychopathy share many of the same characteristics.

93

2001 Tr., v. 18, at 179–80. This sort of testimony in the 2005 retrial could have been "devastating." *See United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

Given the possibility that a risk assessment might backfire, defense counsel could reasonably focus instead on Mr. Harris's difficult upbringing and on his generally positive conduct while in prison. *See Lott v. Trammell*, 705 F.3d 1167, 1209 (10th Cir. 2013) (stating that defense counsel was not ineffective for failing to present a risk assessment because cross-examination could have yielded negative information increasing the chances for a death sentence). "In fact, counsel would have been ineffective if the door to the damaging Risk Assessment Report and evidence contained therein had been opened and the State had been able to exploit it to their advantage." *Id.* We thus deny Mr. Harris's motion to expand the certificate of appealability.

**Conclusion**

We reverse on Mr. Harris's claim of ineffective assistance in defense counsel's failure to seek a pretrial hearing on an intellectual disability. On remand, the district court should revisit the issue of prejudice after conducting an evidentiary hearing.

We also vacate the district court's judgment on the claim of cumulative error. On this claim, the district court should first consider the threshold issues of whether it can consider the prejudice arising from

- the lack of a request for a pretrial hearing on intellectual disability and

- the first prosecutor's exploitation of the jury instruction on Mr. Harris's mitigation evidence.

On the claim of cumulative error, the court should also consider the prejudice resulting from the constitutional error in allowing victim-impact testimony recommending the death penalty.

We affirm the district court's ruling in all other respects and deny Mr. Harris's motion to expand the certificate of appealability.